**2026 IL 131337**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 131337)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. ANTRELL JOHNSON, Appellee.

*Opinion filed March 19, 2026.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Overstreet, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

Justice Tailor took no part in the decision.

**OPINION**

¶ 1    This appeal presents the straightforward issue of whether defendant, Antrell Johnson, was proved guilty beyond a reasonable doubt of the first degree murder of Taurean Tyler. 720 ILCS 5/9-1(a)(1), (2) (West 2016). On the evening of the murder, Tyler and DeAngelo Mixon were walking toward the home of their friend,

Tristan Thomas, when a person ran up and shot them from behind, killing Tyler and wounding Mixon. The sole issue at trial was the identity of the shooter. A Cook County jury found defendant guilty of the first degree murder of Tyler but not guilty of the attempted first degree murder of Mixon.

¶ 2 Mixon and Thomas gave definitive out-of-court statements to investigators that defendant was the shooter, but they attempted to recant their identifications at trial. Janeese Washington and her husband, Robert Laster, also witnessed the shooting. Washington identified defendant as the shooter, but Laster did not.

¶ 3 A divided panel of the Appellate Court, First District, found the State failed to prove defendant guilty beyond a reasonable doubt. 2024 IL App (1st) 220494, ¶ 108. The majority reversed the circuit court's judgment after substituting the test for determining the admissibility of identification evidence set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), in place of the standard for reviewing the sufficiency of the evidence under *Jackson v. Virginia*, 443 U.S. 307 (1979). See 2024 IL App (1st) 220494, ¶¶ 30, 108; *id.* ¶¶ 155-57 (Tailor, P.J., dissenting). To discredit the identifications of defendant, the majority also relied on social science eyewitness identification research studies that were neither presented to the jury nor cited by the parties on appeal. *Id.* ¶¶ 33, 53, 68, 72, 76, 91 (majority opinion); *id.* ¶ 114 (Tailor, P.J., dissenting). Finally, the majority concluded that the split verdict cast doubt on the reliability of the identifications. *Id.* ¶ 99 (majority opinion). For the following reasons, we reverse the appellate court's judgment and remand the cause for further proceedings.

¶ 4                                            I. BACKGROUND

¶ 5 Many facts are not disputed. Tyler and Mixon were shot by the same assailant at the same time. The State relied on the testimony of the four eyewitnesses but did not present a motive or any physical evidence connecting defendant to the shooting.

¶ 6 At about 7:30 p.m. on April 24, 2017, Tyler and Mixon were walking to Thomas's home to smoke marijuana. The sun was still up, and the area was brightly lit. As his friends approached, Thomas stepped onto his front porch, which was six staircase steps above ground level, giving him an elevated view of the street below.

¶ 7 An African American person wearing a dark baseball cap, a dark jacket, and white pants ran up behind Tyler and Mixon, drew a gun, and opened fire. Tyler was shot five times and died from his wounds. Mixon was shot once in the left buttock and survived.

¶ 8 Meanwhile, Washington and Laster were in a car parked near a church just up the street. They were in the rear seats, with Laster on the driver's side and Washington on the passenger side. Washington's friend and her friend's brother were in the front seats, but neither testified. The shooting occurred while the four waited for the church to open for choir rehearsal.

¶ 9 A security camera mounted farther up the street recorded surveillance footage showing a black car drive toward the street where the shooting occurred and reappear about 30 seconds later, driving back the way it had come and chased by the person described as the shooter. The person jumped in the car, and it sped away.

¶ 10 Certain detectives, referred to as "independent administrators" because they were not involved in the investigation, administered separate photographic lineups to the four witnesses. Each witness signed a photo lineup advisory form, which explained that the shooter might or might not be included in the photo array, the independent administrator did not know the shooter's identity, and the witness should not feel compelled to make an identification because it was as important to exclude innocent people as it was to identify the shooter.

¶ 11 Thomas and Mixon viewed photo arrays separately a few hours after the shooting; each identified defendant as the shooter. Thomas and Mixon each told the detectives that they had known defendant for several years. Within 24 hours of their respective identifications, Thomas and Mixon spoke separately with assistant state's attorneys (ASAs) and gave video-recorded statements of their out-of-court identifications of defendant.

¶ 12 Nine days after the shooting, Laster and Washington each viewed photo arrays that included defendant. Laster did not identify anyone from the array. A few days later, he viewed an in-person lineup that included defendant, but he identified someone other than defendant as the shooter. Washington did not view an in-person lineup, but she identified defendant as the shooter from the array she was shown. Washington also identified defendant at trial, and defense counsel conceded that

her testimony was "unimpeached." Neither Washington nor Laster knew defendant before the shooting.

¶ 13                                    A. Thomas

¶ 14    Thomas testified that, on the evening of the shooting, he looked out the window of his house, saw Tyler and Mixon approaching, and went to the front door. He stepped onto the porch and saw someone with a gun run up behind his friends, just as they reached the mouth of the alley next to the house. The person was seven to eight feet from Tyler and Mixon. Thomas shouted to warn them, but "it was too late"; the person opened fire. The photographs marked by Thomas and submitted into evidence show that Thomas was a few feet from the victims when they were shot. Thomas ran to help them. Thomas testified that, when he reached them, Mixon said, "It was Antrell."

¶ 15    The next day, Thomas went to the police station, spoke with detectives, signed the photo lineup advisory form, viewed a six-person photo array, and circled defendant's photograph. A day later, he gave a video-recorded statement to an ASA.

¶ 16    At trial, Thomas admitted that he had identified defendant from the photo array. However, he denied that he got a "clear view" of the shooter, claiming that he could not see the shooter's face because it was "partially" hidden by "something," such that he only "practically" saw the shooter. Thomas claimed to be certain only that the shooter was an African American person who had "[l]ight skin" and was wearing a black jacket.

¶ 17    Thomas admitted that he told the ASA in his video-recorded statement that he had "a clear unobstructed view" of the shooter and could see the shooter's face. Thomas further explained that, when he said he "practically" saw the shooter, he meant he saw "most of [the shooter's] face."

¶ 18    Thomas claimed at trial that he identified defendant from the array because Mixon had told him that defendant was the shooter. But Thomas clarified that he identified defendant because he recognized his photo, not because of Mixon's statement. Thomas eventually admitted at trial that, when he identified defendant

- 4 -

from the array, he told the detective that he saw defendant "shooting yesterday" and confirmed that defendant was "the person who was shooting." Thomas concluded his direct examination by identifying defendant, whom he had "recognize[d] as Trell" on the evening of the shooting, as the person he circled in the photo array and "the same person [he] saw out on the street shoot Torey and Delo."

¶ 19    On cross-examination, Thomas stated that he did not want to be in court that day. He said that he did not call 911 or file a police report after the shooting because he did not recognize the offender. Thomas agreed with defense counsel that he "d[id]n't see distances that well" and "probably should have glasses." Thomas confirmed that he saw who shot Tyler but denied recognizing the person. He denied that the shooter's entire face was covered by a mask and explained that the shooter's face was covered "just a little bit." Thomas conceded that he had identified defendant as the shooter because that was what he had seen, not because he needed to say what the police wanted to hear to "get out of there."

¶ 20                                    B. Mixon

¶ 21    Mixon testified that, as he and Tyler turned onto Thomas's street, he noticed a black car behind them. As Thomas stepped outside, Mixon saw a shocked expression on his face and turned around to see a person standing about a foot away and pointing a gun at Tyler's back. Mixon testified, "I seen the person, but I don't know who it was holding the gun." Mixon was scared and tried to run, but he heard seven shots and "blinked out." Mixon and Tyler fell, and Mixon saw the shooter go back toward the black car. Thomas ran to where Mixon lay in the street and tried to pick him up, but Mixon told him to stop. Mixon claimed not to remember what else he told Thomas.

¶ 22    A paramedic who treated Mixon at the scene assessed his responsiveness under the Glasgow Coma Scale and described Mixon as responsive as an uninjured person would be. Mixon testified that he was transported to the hospital, where he told detectives what happened and "identified the shooter by name."

¶ 23    Then, at about 4 a.m., two independent administrators arrived and showed Mixon a photo lineup advisory form. At trial, Mixon denied remembering anything

about the form, but he admitted that he signed it and consented to be video recorded as he viewed the six-person photo array. Mixon testified that he saw defendant's photo and circled it. Although Mixon claimed at trial not to remember writing "Antrell" next to defendant's picture, he admitted that the name was written next to the picture and appeared to be in his handwriting. One of the independent administrators testified that Mixon "immediately" identified defendant from the array, circled defendant's picture, and wrote "Antrell" next to it. The advisory form contained the detective's summary of Mixon's statement that he "grew up with" defendant, had known him for 10 years, and saw defendant point a gun and shoot Tyler.

¶ 24  Mixon testified that he was not sure whether an ASA had interviewed him after he identified defendant from the photo array. But Mixon eventually admitted that an ASA had video recorded his interview on the morning after the shooting. Mixon admitted that, during the interview, he identified defendant from the photo array as the person who shot him and Tyler.

¶ 25  At trial, Mixon denied recalling what else he told the ASA about defendant, so video-recorded excerpts from the interview were played for the jury. The video showed Mixon telling the ASA that, when Thomas stepped onto his porch and yelled, Mixon turned around and saw "Antrell Johnson," who was standing only a couple feet away and pointing his gun at Tyler. During the interview, Mixon again identified defendant from the photo array as the person who shot him. The video showed Mixon stating that, as he was lying in the street, he told Thomas not to touch him and that "Trell shot me."

¶ 26  The ASA who interviewed Mixon at the hospital testified that Mixon had said that the pain from his injury did not prevent him from reporting what happened. The ASA also confirmed with medical staff that Mixon had not taken any medication since 4:30 a.m., which was six hours before the interview.

¶ 27  On cross-examination, Mixon agreed that in 2017 he smoked a lot of marijuana and drank a lot of alcohol. Mixon denied that he had smoked any marijuana on the day of the shooting but admitted he had consumed an unspecified amount of alcohol sometime earlier that day and had planned to smoke when he arrived at Thomas's house. Mixon testified that he was "traumatized" when the shots went off and denied recognizing the shooter. He claimed that he told the detectives at the hospital

only who he "thought" shot him because he "wasn't sure." Mixon testified he felt bad for identifying someone who had not shot him.

¶ 28 On redirect examination, Mixon admitted that, when he had the first opportunity to speak to detectives at the hospital, he named defendant as the person who shot him. And Mixon admitted that he immediately identified defendant from the photo array. Finally, Mixon stated that he and defendant used to be friends, Mixon had been to defendant's house, their families knew each other, and Mixon's sister and defendant's brother were in a relationship and had a child together. Moreover, Mixon said he was frightened on the day of the trial and worried for his own safety.

¶ 29                                    C. Washington

¶ 30 Washington testified that, while she was in the car waiting for the church to open, she was looking toward the alley next to Thomas's house. Washington had an unobstructed view as she watched "two boys" walking down the middle of the street toward her. After the boys passed the car, Washington saw a person she identified as defendant run up behind them. At first, she thought he was just trying to catch up to them, but when he reached them just before the mouth of the alley, he pulled out a gun and shot them from behind. Defendant fired "a lot, definitely more than four [times]." Washington could not recall in which hand defendant held the gun.

¶ 31 When defendant opened fire, Laster started telling everyone to get down and get out of sight. Washington was scared but did not "duck down," which she understood to mean putting one's head down. Instead, she leaned back and "scooted" down in her seat, and never lost sight of defendant, who was wearing a dark baseball cap and white jeans. The jeans stood out to Washington because she could not understand why a person would wear white jeans to shoot someone. She testified that she remembered defendant's face, which was not something she would forget, and that she was "certain" that he was the person she saw shoot the boys.

¶ 32 Washington and Laster stayed on the scene and spoke with the police for 25 to 30 minutes. According to the officer who spoke to the couple, they "both describe[d] the suspect" as a "male black, medium brown complected," five feet, six inches to five feet, nine inches tall, and 125 to 150 pounds with a black faded

haircut. Defendant's arrest report described him as a 21-year-old Black male, 5 feet, 10 inches tall, and 170 pounds with brown eyes, black hair, a "short hair style," and a "medium brown complexion." The officer clarified at trial that he developed this description based on his conversation with both Washington and Laster.

¶ 33 Nine days after the shooting, Washington went to the police station and identified defendant from a photo array. She told the detectives that she recognized defendant as the shooter from his photo because he had "the same mouth and nose" and "just about the same hair." Washington restated at trial that defendant, the person she identified from the array, was the shooter.

¶ 34 Washington testified that, after identifying defendant from the array, she met with an ASA, who asked her what she had noticed about the shooter's face. She explained that she had not really been able to see the shooter's eyes because he was wearing a baseball cap, but she noticed his nose and lips were "big," and he had "kind of caramel skin." The ASA showed her the photo array from which she had just identified defendant, and Washington said that she "th[ought] that [wa]s him." At trial, Washington explained that she meant she "was pretty sure" that he was the shooter but then clarified that she "wouldn't have picked someone unless [she] w[as] certain."

¶ 35                                    D. Laster

¶ 36 Laster testified that he had also noticed the two young men walking down the street and saw a third man run up behind them, pull a gun from his right jacket pocket, and fire at least five times. There was nothing obstructing Laster's view, it was bright outside, and he could see out the car's windows. Laster estimated the shooter was about 20 feet from the victims.

¶ 37 Laster testified that he was not sure of the shooter's skin color or appearance— he was focused on his companions inside the car and on trying to keep them safe and calm. Laster could not describe the shooter except by his white pants, a black jacket, and a black baseball cap. When he saw the danger had passed, Laster called 911.

¶ 38    Laster told a detective at the scene that he "got a pretty good look" at the shooter and thought he could identify him. About a week later at the police station, Laster could not make an identification from a photo array that included defendant. Laster explained that, during the shooting, he was focused on calming the car's occupants and urging them to crouch down.

¶ 39    Laster returned to the police station a few days later for an in-person lineup that included defendant. Laster signed a new lineup form and felt confident enough to identify the shooter. Laster identified a person who was not defendant. Laster explained again that he had not been looking at the shooter's face during the offense because he had been focused on keeping everyone in the car safe.

### E. Alibi Witnesses

¶ 41    Defendant's ex-girlfriend, Kennedi Myles, testified for the defense that she met defendant at his grandmother's house on the day of the shooting. Myles arrived sometime in the afternoon, and they stayed there for a few hours. Then she and defendant went to her house. Myles did not recall their whereabouts at 7:30 p.m., the time of the shooting. Myles did not recall telling an investigator before trial that she had arrived home between 6 p.m. and 7 p.m. But she admitted that she might have told the investigator that she and defendant arrived at her house between 7 p.m. and 7:30 p.m. Myles testified that it was dark when they arrived at her house. She never told anyone that she was with defendant until she was approached by the defense team, even after defendant was arrested outside her house.

¶ 42    Defendant's mother testified that defendant met her at his grandmother's house on the day of the shooting, collected his daughter, and left. She did not know what time he left, but she testified that it could have been noon or 1 p.m. In any event, defendant left before she did, and he was not with her at 7:30 p.m. She did not know where he was at that time.

### F. Jury Verdict

¶ 44    The circuit court instructed the jurors that they were "the judges of the believability of the witnesses and of the weight to be given to the testimony of each

of them." The court further instructed that, when evaluating a witness's testimony, they "may take into account[ ] his ability and opportunity to observe, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony, considered in the light of all the evidence in this case." See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 1.02). The court also instructed that, when "weigh[ing] the identification testimony of a witness," the jurors "should consider all the facts and circumstances in evidence," including "but not limited to" (1) "[t]he opportunity the witness had to view the offender at the time of the offense," (2) "[t]he witness'[s] degree of attention at the time of the offense," (3) "[t]he witness'[s] earlier description of the offender," (4) "[t]he level of certainty shown by the witness, when confronting the Defendant," and (5) "[t]he length of time between the offense and the identification confrontation." See IPI Criminal No. 3.15.

¶ 45    The jury found defendant guilty of first degree murder for killing Tyler and not guilty of attempted first degree murder for shooting Mixon. The jury also found defendant personally discharged the firearm that killed the victim. Defendant moved for a new trial, claiming that the evidence was insufficient to convict and that trial counsel had rendered ineffective assistance by not calling additional alibi witnesses. The court denied the posttrial motion and imposed a 55-year prison term for first degree murder.

¶ 46                              G. Appellate Court Judgment

¶ 47    Defendant appealed, renewing his posttrial arguments that (1) the evidence was insufficient to prove that he murdered Tyler and (2) trial counsel was ineffective. A divided panel of the appellate court reversed defendant's conviction, holding that "no rational trier of fact could have convicted [defendant] under the test set out in the United States Supreme Court's opinion in *Neil v. Biggers*, 409 U.S. 188 (1972)." 2024 IL App (1st) 220494, ¶ 3. We note here that *Biggers* was not a review of the sufficiency of the evidence. *Biggers* addressed due process limits on the admission of an eyewitness's identification of a defendant to police following a suggestive identification procedure. See *Biggers*, 409 U.S. at 196, 199. The majority did not reach defendant's ineffective-assistance claim (2024 IL App (1st)

220494, ¶ 108) because it found "the State failed to satisfy its evidentiary burden under *Biggers*" (*id.* ¶ 83).

¶ 48    The majority rejected Mixon's out-of-court identification of defendant as the shooter. *Id.* ¶ 65. The majority acknowledged that it is well established that a single witness's identification is sufficient to sustain a conviction and that, "[v]iewing the evidence in the light most favorable to the prosecution, a rational juror might have given more weight to Mixon's statement to the ASA than his trial testimony, due to Mixon's familiarity with [defendant] and familial ties." *Id.* But the majority nonetheless found Mixon's identification insufficient to convict absent "a reason under *Biggers* to reject his unequivocal recantation at trial." *Id.* ¶ 67.

¶ 49    Despite acknowledging that *Biggers* "directs the courts to weigh the ' "totality of the circumstances" ' in 'evaluating the likelihood of misidentification' " (*id.* ¶ 3 (quoting *Biggers*, 409 U.S. at 199-200)), the majority disregarded Mixon's familiarity with defendant at the time of the shooting as a basis to credit Mixon's identification because "*Biggers* contains no exception for eyewitness familiarity" (*id.* ¶ 89). The majority acknowledged this court's prior holdings that an eyewitness's familiarity with the defendant renders other reliability factors less relevant, but the court declined to follow that precedent on the ground that it was "a 25-year-old decision, which in turn cites a 55-year-old decision." *Id.* ¶ 79 (describing the dissent's reliance on *People v. Brooks*, 187 Ill. 2d 91, 130-31 (1999) ("Perhaps the strongest factor weighing in favor of admission is that [the witness] was acquainted with defendant before the crime." (citing *People v. Robinson*, 42 Ill. 2d 371, 375-76 (1969})))). Citing social science literature on eyewitness identifications, the majority expressed a belief that this court's "[o]lder cases in this area of law must be considered with heightened scrutiny." *Id.*

¶ 50    The majority similarly rejected Thomas's identification of defendant as the shooter. It held that his identification "cannot stand" because he testified on cross-examination that he had "poor eyesight" and claimed that he only " 'practically' " saw the shooter and could not describe the shooter other than by skin color and clothing. *Id.* ¶ 64. The majority credited this testimony over Thomas's initial statement to police that he had an unobstructed view of the shooter and that the shooter was defendant. *Id.* ¶¶ 14, 34. The majority did not address Thomas's direct

- 11 -

examination testimony that defendant was "the same person he saw 'out on the street shoot [Tyler] and [Mixon].' " *Id.* ¶ 17.

¶ 51    The majority also rejected Washington's repeated and consistent identification of defendant as the shooter. *Id.* ¶ 68. The majority found her physical description of defendant lacked sufficient "distinct or unique identifiers" to prove his guilt. *Id.* The majority acknowledged that an eyewitness identification is sufficient to convict even if the eyewitness's physical description was general (*id.* ¶ 50 (citing *People v. Slim*, 127 Ill. 2d 302, 309 (1989))) but found that Washington's physical description of the shooter reflected "a lack of attentiveness" from being "rattled by fear" (*id.* ¶ 43). The majority further discredited Washington's identification because she and Thomas used different words to describe the shooter's skin tone as " 'caramel' " and " 'light,' " respectively. *Id.* ¶ 68. The majority also faulted the detectives for not asking Washington to view an in-person lineup, which the majority considered "a crucial investigative step that would have given credence to her selection of [defendant] at the photo array." *Id.*

¶ 52    The majority concluded that, because the shooting happened quickly and was stressful to the eyewitnesses, "each eyewitness's likelihood of misidentification becomes no longer a possibility but an inevitability." *Id.* ¶ 84. In the majority's view, several additional factors also discredited all the identifications. First, although the majority recognized that Laster "testified he did not look at the shooter's face" (*id.* ¶ 35), the majority found that his inability to identify the shooter "detract[ed]" from the credibility of the other eyewitnesses' identifications (*id.* ¶ 63). Second, the majority cited defendant's acquittal for the attempted first degree murder of Mixon as grounds to find that a rational jury could not find that defendant murdered Tyler. *Id.* ¶ 99. Finally, the majority appeared to discredit all the eyewitness identifications based on the general proposition that such evidence is insufficient to support a conviction absent corroborating physical evidence or evidence of motive. *Id.* ¶¶ 103-05.

¶ 53    The dissenting justice would have held that the three eyewitness identifications were sufficient to prove that defendant murdered Tyler. *Id.* ¶¶ 156-57 (Tailor, P.J., dissenting). The dissent noted that the majority (1) "omit[ted] or dismiss[ed] critical facts that favor the State," (2) "accept[ed] recantation testimony of two witnesses that the jury obviously rejected as incredible," (3) "ignore[d] the United States

- 12 -

Supreme Court's holding that a jury's split verdict is irrelevant to a sufficiency of the evidence analysis under the due process clause," and (4) "*sua sponte* invoke[d] social science research in an effort to undermine the identification of all three eyewitnesses even though that research was never presented at trial and the State had no opportunity to refute it." *Id.* ¶ 114.

¶ 54    The State filed a petition for leave to appeal, which we allowed pursuant to Illinois Supreme Court Rule 315 (eff. Dec. 7, 2023). We granted the Exoneration Project, the Innocence Project, and the Illinois Innocence Project leave to submit an *amici curiae* brief in support of defendant's position, pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).

¶ 55                                II. ANALYSIS

¶ 56    The State appeals the reversal of defendant's conviction, raising the issue of whether he was proved guilty beyond a reasonable doubt. To review the appellate court's treatment of this straightforward question, we contrast the test for determining the admissibility of identification evidence at trial (see *Biggers*, 409 U.S. 188) with the familiar standard for reviewing the sufficiency of the evidence (see *Jackson*, 443 U.S. 307) and explain the extent to which the factors of identification reliability articulated in *Biggers* relate to both.

¶ 57    In this case, the appellate majority conflated the two standards and made other errors along the way to reversing defendant's conviction. The State argues we must reverse the judgment of the appellate court and remand the cause for further proceedings on defendant's ineffective assistance of counsel claim. We agree.

¶ 58                            A. Standard of Review

¶ 59    When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, our function is not to retry the defendant. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Rather, "[w]hen a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64; *Jackson*, 443 U.S. at 319. "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *Sutherland*, 223 Ill. 2d at 242. "Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *Jackson*, 2020 IL 124112, ¶ 64. Although a factfinder's presumed credibility determination in favor of the prosecution "is not conclusive and does not bind the reviewing court" (*People v. Gray*, 2017 IL 120958, ¶ 35), "eyewitness testimony may be found insufficient 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' " *Id.* ¶ 36 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)).

¶ 60                    B. Reliability of Identification Evidence

¶ 61                         1. Admissibility Standard

¶ 62        The appellate majority cited the familiar *Jackson* standard yet determined that "no rational trier of fact could have convicted [defendant] under the test set out in the United States Supreme Court's opinion in *Neil v. Biggers*, 409 U.S. 188 (1972)." 2024 IL App (1st) 220494, ¶ 3 (majority opinion). *Biggers* did not address the standard for reviewing the sufficiency of the evidence. Instead, the Court stated in *Biggers*, and reiterated in *Manson v. Brathwaite*, 432 U.S. 98 (1977), the approach for determining whether federal due process requires suppression of an eyewitness identification tainted by police arrangement. *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012). Due process concerns from the admission of identification evidence arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Id.* at 238-39; *Biggers*, 409 U.S. at 198. The use of suggestive and unnecessary procedures does not inevitably compel suppression of the resulting identification. *Brathwaite*, 432 U.S. at 112-13; *Biggers*, 409 U.S. at 198-99.

¶ 63        Instead of mandating a *per se* exclusionary rule, due process requires courts to assess, on a case-by-case basis, whether the police acted improperly and whether that conduct created a "substantial likelihood of misidentification." *Biggers*, 409

U.S. at 201; *Perry*, 565 U.S. at 239; see *Brathwaite*, 432 U.S. at 116. Reliability of the eyewitness identification is the linchpin of that evaluation, and where the indicators of a witness's ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed. *Perry*, 565 U.S. at 239. If not, identification evidence that is otherwise admissible should be submitted to the jury. *Id.*

¶ 64 The central question of admissibility is whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. *Biggers*, 409 U.S. at 199. The factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id.* at 199-200.

¶ 65 Here, defendant does not argue that any of the identifications should have been suppressed, yet the appellate majority consistently mirrored *Biggers*'s reference to "the likelihood of misidentification," as if admissibility were at issue. 2024 IL App (1st) 220494, ¶¶ 3, 30, 62-63, 72, 84. The *Biggers* test for balancing the indicators of a witness's ability to make an accurate identification against the corrupting effect of law enforcement suggestion is not the same as the *Jackson* standard. Thus, the *Biggers* test for determining whether an identification should have been suppressed simply does not apply to a review of the sufficiency of the evidence. The appellate majority erred by applying the *Biggers* test for admissibility as a basis for finding that defendant was not proved guilty beyond a reasonable doubt of first degree murder.

¶ 66                                              2. Sufficiency Standard

¶ 67 Pointing out the appellate majority's error does not end the inquiry, however, because the parties dispute the extent to which the factors articulated in *Biggers* relate to a review of the sufficiency of the identification evidence. The State contends that the appellate majority compounded its mistaken application of the *Biggers* test for admissibility by erroneously treating the five reliability factors as an exclusive list without considering the totality of the circumstances.

¶ 68       Defendant responds that, because the State conceded in the appellate court that the *Biggers* factors are relevant to assessing the sufficiency of the evidence, the State should be estopped from arguing the appellate majority misapplied *Biggers*. *People v. Denson*, 2014 IL 116231, ¶ 17 ("[A] party may not request to proceed in one manner and then later contend on appeal that the requested course of action was in error."). Defendant points out the State conceded in the appellate court that it was "relying on the well-settled and widely recognized factors under *Biggers*." Defendant's estoppel argument reflects a misunderstanding of the State's position. The State clarifies in its reply brief that its position has always been that the totality of the circumstances, including the *Biggers* factors and the witnesses' familiarity with the offender, are relevant to whether the identification evidence, when viewed in the light most favorable to the prosecution, could allow any rational factfinder to find guilt beyond a reasonable doubt. The State's arguments here and in the appellate court are consistent and correct.

¶ 69       The crucial distinction is between (1) the *Biggers* admissibility test for assessing whether an identification must be suppressed because improper police conduct created a substantial likelihood of misidentification and (2) the five *Biggers factors*, themselves, which can be used to weigh identification evidence in contexts other than admissibility. Indeed, courts often refer to the *Biggers* factors when assessing the quantum of identification evidence presented at trial, including when admissibility of the identification is not at issue. See *Perry*, 565 U.S. at 246 ("Eyewitness-specific jury instructions, which many federal and state courts have adopted, likewise warn the jury to take care in appraising identification evidence."); see, *e.g.*, *Slim*, 127 Ill. 2d at 307-08 (analyzing the five *Biggers* factors in context of challenge to sufficiency of the evidence); *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007) (analyzing *Biggers* factors to determine whether identification evidence was closely balanced under plain-error doctrine).

¶ 70       When a trial court determines that identification testimony was elicited by suggestive and unnecessary police procedures, the court should exclude the identifications only if the improper police conduct created a substantial likelihood of misidentification in light of the *Biggers* factors. But once identification evidence has been properly admitted, the decision to credit the identification must be resolved by the finder of fact. See, *e.g.*, *People v. Holmes*, 141 Ill. 2d 204, 242 (1990) ("While [a] large time lapse [between offense and identification] might be

significant, it only goes to the weight of the testimony, making it a question for the jury.").

¶ 71       Here, the jury was appropriately instructed to consider "all the facts and circumstances in evidence" when deciding whether to credit the identifications. See IPI Criminal No. 3.15. And the five factors in the pattern jury instruction are the same factors the *Biggers* Court listed for testing the admissibility of problematic identification testimony. " 'This new instruction is in accord with the well-settled principle that there are five factors that should be considered in determining the reliability of identification evidence.' " *People v. Herron*, 215 Ill. 2d 167, 191 (2005) (quoting *People v. Jackson*, 348 Ill. App. 3d 719, 739 (2004)). Although defendant has never contested the admission of the identifications, "all the facts and circumstances," including the *Biggers* factors, are relevant to this appeal to the extent they guided the jury in weighing the identifications of defendant as the offender. See IPI Criminal No. 3.15.

¶ 72       When a conviction hinges on identification evidence, the appellate court should consider the *Biggers* factors as part of the totality of the circumstances when reviewing the jury's presumed credibility determination in favor of the prosecution. But this is the point at which the appellate majority went astray, by deciding the conviction must be reversed because the circumstances of the witnesses' observations created a substantial likelihood of misidentification, which is not the standard for reviewing the sufficiency of the evidence. The majority should have followed the familiar *Jackson* standard that dictates a reviewing court may conclude the identification evidence is insufficient only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.

¶ 73       *Brooks*, which addressed both the admissibility and the sufficiency of identification evidence, seems to be a source of some confusion on the topic. In *Brooks*, the defendant was convicted based on identifications by four eyewitnesses, two of whom recanted their identifications. *Brooks*, 187 Ill. 2d at 132. On appeal, the defendant cited the recantations and conflicts in the testimony to challenge the identifications' admissibility and sufficiency. *Id.* This court determined the identifications had been properly admitted and found them to be sufficient to sustain the conviction. *Id.* at 133.

¶ 74 On the sufficiency issue, the defendant argued the identifications were not credible because the police used suggestive procedures to elicit the identifications, and he cited the *Biggers* factors to assert the identifications did not prove his guilt beyond a reasonable doubt. *Id.* at 124-30. The *Brooks* court answered his argument with an isolated comment: "these arguments are better directed toward the admissibility of the statements" because "[o]nce the statements are deemed to be admissible, our standard of review is limited to the [*Jackson* standard, as applied in *People v. Collins*, 106 Ill. 2d 237 (1985)]." *Id.* at 134. This statement was imprecise, as the *Biggers* factors themselves are relevant to both admissibility and sufficiency, though they are weighed differently in each instance. While the identifications in *Brooks* did not present due process concerns, the defense was free to argue to the jury (and then to a reviewing court) that, under the totality of the circumstances, the identifications should not be credited because the police procedures that elicited the identification were suggestive and unnecessary. However, the identifiers' testimony could be found insufficient to convict only if the record evidence compelled the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id.* ("Once the statements are determined to be admissible, our standard of review is limited to the *Collins* standard of determining whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found defendant guilty beyond a reasonable doubt."); see *Sample v. Commonwealth*, 897 S.E.2d 68, 76 (Va. 2024) ("Because [the witness's] identifications did not present due process concerns and were admissible into evidence at trial, we give deference to the trial court's finding that both identifications were credible and cannot say that no rational trier of fact could find them credible.").

¶ 75                    3. Sufficiency of the Evidence at Trial

¶ 76 With this framework in mind, we review the sufficiency of the evidence supporting the conviction. To prove defendant guilty of first degree murder for fatally shooting Tyler, the State had the burden to prove beyond a reasonable doubt that (1) defendant fatally shot Tyler and, in doing so, (2) either intended to kill or do great bodily harm to Tyler or knew that there was a substantial probability that repeatedly shooting Tyler created a strong probability of killing or doing great bodily harm to him. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2016). The parties agree

that the person who walked up behind Tyler, pointed a gun at him, and shot him five times, killing him, committed first degree murder. See *People v. Thomas*, 171 Ill. 2d 207, 219 (1996) (evidence that one intentionally pointed a gun at someone and fired is sufficient to prove requisite intent for first degree murder). The remaining question is whether the State met its burden of proving that defendant was the shooter. The State is correct that, when viewed in the light most favorable to the prosecution, the identifications by Mixon, Thomas, and Washington satisfy that burden. See *Jackson*, 2020 IL 124112, ¶ 64; *Jackson*, 443 U.S. at 319.

¶ 77    "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36; *Slim*, 127 Ill. 2d at 307. As the dissent observed below, "[t]he State presented not one, but three eyewitnesses, and all three positively identified [defendant] as the shooter shortly after the shooting occurred," which corroborated the accuracy of their respective identifications. 2024 IL App (1st) 220494, ¶ 156 (Tailor, P.J., dissenting). Viewing the evidence in the light most favorable to the prosecution shows Thomas, Mixon, and Washington each had an opportunity to view the shooter, each was focused on the shooter, and each identification of defendant, made a short time after the offense, was consistent. See *Biggers*, 409 U.S. at 199-200.

¶ 78    Thomas testified that he was standing at his front door when he saw defendant approach Mixon and Tyler from behind, draw a gun, and open fire on them. Defendant fled, and Thomas ran to help Mixon, who said "It was Trell." Thomas then identified defendant from a photo array as the person who shot Tyler.

¶ 79    Although the shooting lasted less than a minute, Thomas had time to view and recognize defendant, whom he knew before the shooting. Thomas had an unobstructed view of the shooting. He was standing on his elevated front porch, in broad daylight, and he was focused on the shooter.

¶ 80    Mixon testified that, when he saw Thomas's shocked expression, he turned and saw the shooter, whom he identified to detectives by name when he spoke with them at the hospital. The State presented evidence that, moments after the shooting, Mixon told Thomas that defendant was the shooter. According to a detective, Mixon also identified defendant immediately after viewing the photo array. The video of Mixon's interview at the hospital showed Mixon naming defendant as the

- 19 -

shooter and admitting he made the same identification to Thomas at the scene. Mixon had an adequate opportunity to view the shooter, who was just a few feet away. And a detective testified that Mixon said he had known defendant for 10 years before the shooting. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 89 (in addition to the *Biggers* factors, "[o]ur courts also consider whether the witness was acquainted with the suspect before the crime"); *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 35 ("the familiarity of two eyewitnesses with [the defendant] personally, support the conclusion that the evidence was sufficient").

¶ 81 At trial, Thomas and Mixon each tried to recant their prior identifications of defendant. However, recantations are generally regarded as unreliable, especially where it might have resulted from duress or perceived threat, and it is for the trier of fact to determine the credibility of recantation testimony. *Jackson*, 2020 IL 124112, ¶ 67. Here, the reasons for the jury's apparent rejection of the recantations are obvious. Mixon testified that he had known defendant for many years and continued to fear for his safety. The jury could have reasonably found that Mixon recanted due to his familial ties to defendant's family or because it believed, based on his demeanor at trial, that Mixon was scared to identify defendant again. Thomas claimed at trial that he did not really see the shooter, but he ultimately admitted that defendant was "the same person [he] saw out on the street shoot [Tyler] and [Mixon]." The appellate majority emphasized Thomas's assertion that he had poor eyesight, but that testimony was elicited by leading questions at trial. Thomas never told the police he had poor eyesight or that he could not see the shooter's features. The guilty verdict makes apparent that the jury found Thomas and Mixon were honest when they made their initial out-of-court identifications of defendant and that they were dishonest at trial. We defer to the jury's credibility assessments because a court of review cannot observe the witness as he testifies. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) ("The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the *** jury that saw and heard the witnesses.").

¶ 82 Washington identified defendant repeatedly and consistently. She testified that she had an unobstructed view of defendant as he ran past her to catch up to Tyler and Mixon, shot them, and then ran past her again as he fled. Washington identified defendant as the shooter from a photo array nine days after the shooting and testified at trial she would never forget defendant's face because she was "certain"

he was the shooter. Washington had the opportunity to view defendant and was focused on his actions. She testified that, despite scooting down in her seat, she never lost sight of defendant.

¶ 83    To discredit the identifications by Washington, Mixon, and Thomas, the appellate majority emphasized Laster's inability to identify defendant from the photo array and his identification of someone other than defendant from the in-person lineup. However, Laster admitted his focus was not on the shooter but on keeping the other occupants in the car safe and calm. By contrast, Mixon and Thomas were much closer to the shooter, and Washington explained that she could identify defendant because she never lost sight of him.

¶ 84    The jury heard some general or imprecise descriptions of defendant's height, weight, and skin tone. But "a witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." *Slim*, 127 Ill. 2d at 309; see *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 28 ("general or imprecise description *** does not necessarily render the witness's identification unreliable"). Eyewitness testimony may be found insufficient only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. This is not such a case, where the jury was free to reject the recantations at trial and credit the positive eyewitness identifications. See *Brooks*, 187 Ill. 2d at 133 (pointing out deficiencies in the recantations and explaining that the minor inconsistencies in the trial testimony were to be expected whenever several persons witness the same event under traumatic circumstances).

¶ 85    The appellate majority reached a contrary result by distorting the standard of review and simply disregarding this court's precedent. The majority cited the *Jackson* standard but effectively reviewed the identification evidence *de novo*—if not in the light most favorable to defendant—and discounted Thomas's and Mixon's familiarity with defendant.

¶ 86    The majority found that none of the witnesses had an adequate opportunity to view the offender during the shooting (2024 IL App (1st) 220494, ¶¶ 34-37 (majority opinion)) because "each eyewitness caught a fleeting glimpse of the shooter, mainly from behind, amid an extremely stressful situation" (*id.* ¶ 33). The majority also found all the witnesses were distracted by the presence of the firearm

(*id.* ¶¶ 39-45), the witnesses did not describe defendant's appearance accurately (*id.* ¶¶ 47-51), and Laster seemed the most certain of his identification despite not identifying defendant as the shooter (*id.* ¶¶ 53-56). The majority concluded that "the four eyewitnesses' statements before and during the trial attest that the rapid shooting's compressed timeframe left little room for them to observe or process. And this, in turn, left little for the jury to sift, weigh, and assess before drawing inferences." *Id.* ¶ 61. In other words, the majority simply decided not to defer to the jury's credibility determinations on the grounds that the shooting happened quickly.

¶ 87        Moreover, the majority found that Thomas's and Mixon's prior acquaintance with defendant did not excuse their failure to describe his appearance to the police, as though they needed to specify his height and weight because identifying the shooter by name as someone they knew was not enough to render their identifications credible. *Id.* ¶¶ 65-67, 89. In *Brooks*, we explained that "whether the witness was acquainted with the suspect before the crime" is not only relevant to identification reliability; it "is particularly important because it renders the other factors less relevant." *Brooks*, 187 Ill. 2d at 130. Yet the majority declared *Brooks* must be viewed with "heightened scrutiny" based on the majority's view of subsequent developments in social science. 2024 IL App (1st) 220494, ¶ 79. The majority rejected *Brooks* entirely on the ground that, "[a]fter over 50 years of case law, one can find support for nearly any proposition." *Id.* ¶ 74. But the majority was not free to disregard this court's precedent and *stare decisis*. Where this court has declared the law on any point, it alone can overrule and modify its previous opinion. *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 38. Once this court has ruled, the lower judicial tribunals are bound by such decision, and it is the duty of such lower tribunals to follow such decision in similar cases. *Id.* If the appellate majority disagreed with *Brooks*, it remained bound by that decision and should have left it to this court to reassess the decision's validity (see *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 29), as the appellate court lacks authority to declare this court's precedent a "dead letter" (*Yakich v. Aulds*, 2019 IL 123667, ¶ 13).

¶ 88        Further, the majority relied on *People v. Coulson*, 13 Ill. 2d 290, 296, 298 (1958), which held that a reviewing court must "always" set aside verdicts resting on ostensibly conflicting evidence that proves "improbable, unconvincing and completely unsatisfactory." 2024 IL App (1st) 220494, ¶ 96. But the majority cited *Coulson* for the proposition that deferring to the jury as trier of fact "does not

replace our role of oversight." The majority deployed the term "oversight" as a baseless justification to substitute its credibility determinations for those of the jury. We agree with the dissent that the appellate court, when reviewing the sufficiency of identification evidence, must follow the *Jackson* standard, which shows deference to the jury, not "[u]nfettered reverence for the jury's verdict," as the majority implied. See *id.*; see also *id.* ¶¶ 123, 131 (Tailor, P.J., dissenting) (the majority usurped the jury's prerogative and invaded the province of the jury).

¶ 89                    C. Eyewitness Identification Research

¶ 90        Upon deciding that the evidence supports the conviction, we take this opportunity to comment on additional errors in the appellate majority's opinion. The State points out the majority *sua sponte* relied on social science eyewitness identification research studies to support its reversal of defendant's conviction.

¶ 91        For example, the majority concluded that "inferring that Mixon recognized [defendant] remains improbable" given "the weapon focus effect." *Id.* ¶ 65 (majority opinion). The "weapon focus effect" was a factor that the majority derived from its review of an article that was neither presented at trial nor cited by the parties on appeal. The majority cited the theory for the proposition that "the presence of a weapon commands an eyewitness's attention and diminishes the ability of the eyewitness to describe or recognize the offender." *Id.* ¶ 33 (citing Jonathan M. Fawcett, Kristine A. Peace & Andrea Greve, Looking Down the Barrel of a Gun: What Do We Know About the Weapon Focus Effect?, 5 J. of Applied Res. in Memory & Cognition 257, 261 (2016)). The majority claimed that "[o]ver 40 years of extensive research on eyewitness identification shows that the presence of a weapon commands an eyewitness's attention and diminishes the ability of the eyewitness to describe or recognize the offender, a phenomenon known as the weapon-focus effect." *Id.*

¶ 92        The majority *sua sponte* cited another article for the proposition that a witness's familiarity with the accused does not eliminate misidentification problems but can, in fact, contribute to wrongful convictions. The majority stated, as a matter of fact, that "[w]e now know '[e]mpirical evidence and an array of DNA exonerations have confirmed that familiarity does not eliminate misidentification problems.' " 2024 IL App (1st) 220494, ¶ 91 (quoting James E. Coleman Jr. *et al.*, *Don't I Know You?*

*The Effect of Prior Acquaintance/Familiarity on Witness Identification*, The Champion 52, 54 (Nat'l Ass'n of Crim. Def. Law. Apr. 2012). The majority asserted, " 'because information about a familiar individual's identity is already stored in an identifier's brain, both contextual information and expectations triggered by surroundings or circumstances associated with the familiar person "prime" the identifier's brain to more likely misidentify a stranger as the familiar person.' " *Id.* ¶ 92 (quoting Coleman, *supra*, at 54). Based on this theory, the majority found Thomas's and Mixon's familiarity with defendant rendered their identifications of defendant *less* reliable.

¶ 93    The defense argued generally to the jury that the identifiers were distracted by the presence of a weapon, but the social science articles on which the majority relied were not presented at trial. Review of the sufficiency of the evidence at trial "must be limited to evidence actually admitted at trial, and judicial notice cannot be used to introduce new evidentiary material not considered by the fact finder during its deliberations." *People v. Cline*, 2022 IL 126383, ¶ 32; see *Herrera v. Collins*, 506 U.S. 390, 402 (1993) ("[T]he sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' " (quoting *Jackson*, 443 U.S. at 318)).

¶ 94    Furthermore, expert testimony is necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's and when it will aid the jury in reaching its conclusion. *People v. Lerma*, 2016 IL 118496, ¶ 23. Here, the majority conceded that the "articles in legal and research journals" upon which it relied to discredit the identifications involved science that was " 'largely unfamiliar to the average person' and include[d] 'counterintuitive' principles." 2024 IL App (1st) 220494, ¶ 80 (quoting *Lerma*, 2016 IL 118496, ¶ 24). So, even if defendant had wished to present the social science theories concerning eyewitness reliability, *Lerma* would have required expert testimony to explain them to the jury. The majority simply disregarded the expert-testimony requirement and improperly concluded it could use the literature to assess the sufficiency of the evidence without the jury weighing it. *Id.* ¶ 94.

¶ 95    The majority relied on *Lerma* for the proposition that focusing on a weapon distracts from identification. See *Lerma*, 2016 IL 118496, ¶ 26. But in *Lerma*, the defendant was appealing the suppression of expert testimony on eyewitness identifications. The two experts intended to opine on factors potentially

contributing to the unreliability of eyewitness testimony, including "the stress of the event itself, the use and presence of a weapon, the wearing of a partial disguise, exposure to postevent information, nighttime viewing, and cross-racial identification." *Id.*

¶ 96  *Lerma* does not stand for the proposition that the appellate court may seek out and rely on scientific literature concerning the reliability of eyewitness testimony. Instead, it reinforces the principle that a defendant cannot rely on scientific evidence on a matter of uncommon knowledge to challenge the prosecution's case unless he presents that evidence through the testimony of an expert witness at trial. See *People v. Heineman*, 2023 IL 127854, ¶ 74 ("Scientific evidence is based on principles that are not within the knowledge or experience of the average juror," and "[s]uch evidence is meaningless to an average juror unless it is accompanied by an explanation provided by an expert witness."). Here, defendant did not offer any scientific evidence concerning eyewitness reliability, let alone an expert's opinion to support it.

¶ 97  Defendant argues the appellate majority did not take judicial notice of any evidentiary facts; rather it was appropriately using academic articles as persuasive authority to explain its reasoning. Defendant contends the majority "cited to scientifically-backed articles as persuasive authority to inform why the inferences made by the jury concerning particular aspects of the eyewitness testimony were unreasonable despite the counterintuitive nature of the reasoning." Stated differently, the majority relied on the extra-record materials to discredit the eyewitness identifications presented at trial, which is contrary to the appellate court's role. A reviewing court evaluating the sufficiency of the evidence may not consider material that was not considered by the trier of fact in weighing the witness's credibility. *Cline*, 2022 IL 126383, ¶ 33. Contrary to defendant's assertion, the majority lacked discretion to consider evidentiary matters outside the record. See *id.* ¶ 32.

¶ 98  Defendant also claims the academic articles played little role in the majority's decision. However, the dissent astutely observed that, by raising the theories *sua sponte*, the majority deprived the State of the opportunity to address the research and whether it affected these identifications. The State had no warning that it might factor into the appellate court's decision. Notably, had the appellate majority

consulted extra-record evidence to *affirm* the conviction, defendant could have potentially alleged a due process violation. See *People v. Harris*, 57 Ill. 2d 228, 231 (1974) ("a trial judge in his deliberations [as factfinder] is limited to the record made before him at trial and should he draw conclusions based on any private investigation made by him the accused will have been denied due process of law").

¶ 99                                    D. Split Verdict

¶ 100       Finally, the appellate majority improperly relied on the acquittal for attempted first degree murder to discredit the identifications supporting the murder conviction. The majority held that the jury's split verdict "signals potential doubts about the reliability of the evidence and the credibility of the witnesses." 2024 IL App (1st) 220494, ¶ 99. However, it is well settled that a jury's acquittal on one count may not be considered when evaluating the sufficiency of the evidence on another count. *United States v. Powell*, 469 U.S. 57, 67 (1984) (improper to consider a jury's split verdict when evaluating the sufficiency of the evidence). A review of the sufficiency of the evidence involves the determination of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt, and this review should be independent of the jury's determination that evidence on another count was insufficient. *Id.* Moreover,

> "[t]he question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder—if known." *Jackson*, 443 U.S. at 319 n.13.

¶ 101       Defendant responds that the State forfeited the argument by omitting it from its petition for leave to appeal. However, parties forfeit issues, not arguments (*Brunton v. Kruger*, 2015 IL 117663, ¶ 76), and the State's petition raised the issue of whether the majority erroneously found the evidence insufficient to convict. The majority's erroneous reliance on the acquittal as grounds to reverse the conviction relates to whether defendant was proved guilty beyond a reasonable doubt, so the State did not forfeit its argument.

¶ 102    Noting that the independent review of the sufficiency of the evidence is a safeguard against an irrational jury verdict (*Powell*, 469 U.S. at 67), defendant points out the majority did not hold that the split verdict *mandated* reversal of the conviction, only that it reflected "the jury's uncertainty regarding the State's evidence" and was a factor to consider when reviewing the evidence.[1] Regardless, the majority clearly erred by relying on the not guilty verdict to discredit the testimony supporting the guilty verdict. We note the majority found it "naïve" to think "the jury's verdict regarding the shooting of Tyler can be entirely divorced from its verdict regarding the shooting of Mixon, especially when the same evidentiary foundation underlies both." 2024 IL App (1st) 220494, ¶ 99. But the majority's musings are not grounds for rejecting the well-settled principle that a reviewing court may not consider a jury's split verdict when evaluating the sufficiency of the evidence. *People v. Hale*, 2013 IL 113140, ¶ 20 (the supremacy clause (U.S. Const., art. VI, cl. 2) binds Illinois courts " 'to follow the United States Supreme Court's interpretation of the Constitution of the United States.' " (quoting *People v. Wagener*, 196 Ill. 2d 269, 287 (2001))); see 2024 IL App (1st) 220494, ¶ 151 (Tailor, P.J., dissenting) (citing *Powell*, 469 U.S. at 67).

¶ 103                              III. CONCLUSION

¶ 104    For the preceding reasons, the judgment of the appellate court is reversed, and the cause is remanded for the appellate court to consider defendant's claim of ineffective assistance of counsel.

¶ 105    Appellate court judgment reversed and remanded.

¶ 106    JUSTICE TAILOR took no part in the consideration or decision of this case.

---

[1]Defendant does not contend that the verdicts of guilty and not guilty are legally inconsistent. Legally inconsistent verdicts occur when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 57. Instead, defendant argues the not guilty verdict casts doubt on the evidence supporting the guilty verdict.