2026 IL App (1st) 231435-U

No. 1-23-1435

First Division
March 31, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09 CR 9349 |
| KEVIN WATSON, | ) ) ) | Honorable Ursula Walowski |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Presiding Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's judgment denying defendant's postconviction petition following a third-stage evidentiary hearing was not manifestly erroneous.

¶ 2    Following a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), the trial court denied defendant-appellant Kevin Watson's postconviction petition, which asserted a claim of actual innocence. Defendant appeals from that judgment, arguing that the new evidence presented at the evidentiary hearing showing that he was

not the shooter, when viewed against the original trial evidence, made it more probable than not that a jury would reach a different result at a new trial. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On April 24, 2009, defendant, who was 15 years old at the time, was arrested and subsequently charged with, *inter alia*, multiple counts of first degree murder based on allegations that defendant was involved in the shooting death of 18-year-old Tommie Williams on April 2, 2009.

¶ 5                                A. Jury Trial

¶ 6    At defendant's jury trial, the following evidence was adduced.

¶ 7    Gerard Baker testified that he was friends with defendant in 2009, at which time Baker was 16 years old. On April 2, 2009, he took the bus to visit his aunt who lived at 61st Street and Drexel Avenue. After exiting the bus, he saw four or five people, "just hanging around," including defendant. Baker joined the group, and they walked to Davead McIntyre's apartment, which was located on Cottage Grove Avenue near 62nd Street. At McIntyre's apartment, Baker played a video game for a couple of hours with defendant, McIntyre, and Juan Ward.

¶ 8    Baker acknowledged that he spoke with assistant state's attorney Maureen Renno and Chicago police detective Neil Maas on April 18, 2009, with his stepfather present. ASA Renno memorialized Baker's statement, which he signed. However, Baker testified that he did not remember informing ASA Renno that defendant ran to the window, looked outside, and then left the apartment. Baker testified that defendant and McIntyre walked out of the apartment, and he heard gunshots and looked out the window, although he did not recall what he saw. Baker denied stating to ASA Renno that he observed defendant running south on Cottage Grove towards 62nd Street or that defendant was "crouched" as he was running, holding his arms close to his body.

Baker testified that he did not know if any of the individuals at McIntyre's house were affiliated with a gang, but he knew that they "hung around" with Gangster Disciples, including himself. Baker did not know that Williams was a member of the Black P-Stones.

¶ 9     On cross-examination, Baker testified that he could not recall what defendant was wearing on April 2 and did not recall telling Detective Maas that defendant was wearing a faded purple hooded sweatshirt. He also testified that he did not read or review his statement and that ASA Renno never read it to him.

¶ 10     ASA Renno testified that, on April 18, 2009, she spoke with Baker and memorialized his statement, which Baker reviewed. Both Baker and his stepfather signed the statement. ASA Renno read portions of the statement to the jury, indicating that Baker observed defendant wearing a dark-colored hooded sweatshirt that day, McIntyre said to the other boys that there were "hooks"[1] outside, defendant told Baker that Williams was outside, defendant ran out of the apartment just prior to the shooting, and Baker observed defendant running southbound and holding his arms close to his body after the shooting.

¶ 11     Timothy Robinson testified that, at the time of trial, he was on probation and he had not been threatened or promised anything in exchange for his testimony. He acknowledged that his criminal history included a 2008 felony conviction for possession of a controlled substance with intent to deliver and a 2010 felony conviction for possession of cannabis.

¶ 12     In April of 2009, Robinson lived on Cottage Grove Avenue, near 61st Street. Around 5 p.m. on April 2, he was smoking marijuana outside of his apartment building, "up under the porch." Other individuals outside with him included William Jones ("Bud"), "Manny," and "Debo."

---

[1] Officer Emmett McClendon, a gang expert, testified that "hook" was a derogatory term for a member of the Black P-Stones.

Robinson observed Williams approach and speak with Jones near the gate to a parking lot. As he was smoking, he heard gunshots and saw people running away. Robinson hid behind a wall. He believed that the shots came from the nearby parking lot. When Robinson came out from behind the wall, he observed Williams "collapse[ ] across the street somewhere[.]"

¶ 13    On April 16, 2009, Robinson spoke with Detective Maas at the police station. Robinson testified that he did not remember telling the detective the following: that he saw a "shorty" (a young person) wearing a purple hooded sweatshirt walking through the parking lot and heading in the direction of Williams; that this individual had his right hand in his sweatshirt pocket; or, that after the gunshots, this individual ran south on Cottage Grove. Robinson testified that Detective Maas showed him a photo array and asked him if any of the individuals pictured were defendant. He identified defendant from the photo array but not as the individual he observed on the day of the shooting.

¶ 14    The following day Robinson made a formal statement to assistant state's attorney Ashley Moore. He admitted signing the statement but denied telling ASA Moore that he recognized the "shorty" as defendant. Robinson testified that, on April 25, 2009, he returned to the police station to view a line-up. He identified defendant in the line-up but denied identifying him as the person he saw approaching Williams. Robinson acknowledged testifying before a grand jury on April 27, 2009, and speaking with assistant state's attorney Krista Peterson prior to testifying that day. When asked specific questions about his grand jury testimony, he repeatedly answered that he did not remember.

¶ 15    On cross-examination, Robinson testified that, at the time of the gunshots, he was talking with some girls with his back to the parking lot, so he did not see anything. He further testified that he did not know that Williams was a Black P-Stone. On redirect examination, Robinson

testified that he informed Detective Maas, ASA Moore, and ASA K. Peterson that he was getting "high" on the porch that day.

¶ 16    Detective Maas testified that he spoke with Robinson on April 16, 2009. Robinson told him that he observed a young, black male wearing a purple hooded sweatshirt skipping towards Williams with one hand in his sweatshirt pocket. After hearing two gunshots, Robinson observed that same person running south on Cottage Grove. Robinson never informed Detective Maas that he was smoking marijuana that day. Detective Maas showed Robinson a photo array, and Robinson identified defendant as the person who fired the gun at Williams. On cross-examination, Detective Maas clarified that Robinson never said that he saw defendant shoot Williams, only that defendant ran up behind Williams at the time of the shooting. Robinson also viewed a lineup and identified defendant.

¶ 17    ASA Moore testified that, on April 17, 2009, she memorialized Robinson's statement and allowed Robinson to read the statement and make any corrections. Robinson subsequently signed the statement. ASA Moore read portions of the statement, setting forth that Robinson observed: defendant wearing a purple hooded sweatshirt, defendant with one hand in his sweatshirt pocket, defendant approaching Williams, and defendant running down Cottage Grove after Robinson heard the gunshots. ASA Moore testified that Robinson never informed her that he was smoking marijuana that day.

¶ 18    ASA K. Peterson testified regarding Robinson's grand jury testimony on April 27, 2009. She read portions of the grand jury transcripts, in which Robinson testified that he saw defendant walking towards the gate where Williams was standing, defendant was wearing a purple hooded sweatshirt, defendant had a hand inside his sweatshirt pocket, and he saw defendant running on Cottage Grove towards 62nd Street.

¶ 19    William Jones, also known as "Bud," testified that, on April 2, 2009, he was in the area of the shooting visiting his grandmother. At some point, he left her house to buy loose cigarettes. He saw Robinson standing outside of his (Robinson's) apartment building. As Jones was talking to a girl, Williams, who Jones had known for many years, approached him. Williams and Jones walked toward the gate to the parking lot area, slightly away from the apartment building. As Jones passed Williams a cigarette, he heard two or three "real close" gunshots and everyone ran in different directions. He testified that he did not see anyone approach or point a gun at Williams. He further testified that he did not know defendant. Right after the shooting, Jones heard Williams say he had been shot before collapsing to the ground and Jones ran to Williams's grandmother's home at 60th and Cottage Grove to inform his family. When he returned to the scene of the shooting, he did not speak with police about what he saw because he had recently been released from prison.

¶ 20    On April 16, 2009, the police brought Jones to the police station. Jones testified that Chicago police detective Gary Bush asked him if he knew defendant and he responded that he did not. Detective Bush then showed Jones a picture of defendant and asked Jones if that was defendant. Jones responded that it was because the detective had just said that it was and the photo had defendant's name on it. Jones initialed the photo. On April 24, Jones returned to view a lineup, where he was asked to pick out defendant, which he did because he had been shown a photo of defendant multiple times before the lineup.

¶ 21    On April 17, Jones spoke with assistant state's attorney Lori Rosen, who memorialized Jones's statement as to what occurred on the day of the shooting. Jones signed the statement. Jones denied informing ASA Rosen that he knew defendant as "Little Kevin" and that he had seen defendant in the neighborhood previously. Jones also denied telling ASA Rosen that he saw defendant point a gun at Williams from ten feet away and that defendant was wearing a dark

hooded sweatshirt, but the hood did not cover defendant's face. He further denied stating to ASA Rosen that the gun sounded like a revolver to him and that he observed defendant running down the sidewalk on Cottage Grove and trying to hide the gun by clutching it to his body.

¶ 22 Jones acknowledged that he testified before a grand jury on April 30, but he denied testifying that he knew defendant prior to the shooting. When read excerpts of the transcripts of his grand jury testimony, he admitted that he did answer the questions. Specifically, he acknowledged that he testified that defendant approached Williams, fired a gun at Williams from ten feet away, and was wearing a black hooded sweatshirt.

¶ 23 On cross-examination, Jones acknowledged that he had prior felony convictions for delivery of a controlled substance, possession of a controlled substance, and drug conspiracy. He testified that there were about 15 people in the parking lot on the day of the shooting. He also testified that he did not know that Williams was in a gang. Finally, he testified that he did not see the face of the person who shot Williams and he did not know defendant at that time.

¶ 24 Detective Bush testified that he spoke with Jones on April 16 and showed him a photo array. Jones identified defendant from the array as the person he saw shooting in the direction of Williams. Detective Bush testified that he did not show Jones a picture of defendant prior to showing him the array and to his knowledge no one else did. Detective Maas testified that after arresting defendant, a lineup was conducted. From that lineup, Jones identified defendant as the person who fired a gun at Williams.

¶ 25 ASA Rosen testified that she spoke with Jones on April 17, 2009. She memorialized his statement and reviewed it with him before he signed it. She read a portion of this statement to the jury:

"As they got to the area where the gate meets the sidewalk, Bud turned and looked over his left shoulder. Bud heard a gunshot. Bud saw Little Kev – Lil Kev who he now knows as Kevin Watson and who he has seen in that neighborhood a few times. Bud identified Lil Kev in People's Exhibit Number 4. Bud saw Lil Kev pointing a gun at Williams. Lil Kev was wearing a dark hoodie, meaning a hooded sweatshirt. But the hood did not cover Lil Kev's face and was only halfway up Lil Kev's head. Lil Kev was about 10 feet behind them and was holding his right hand straight forward while he pointed his gun at Williams's back."

She also read:

"Bud was shocked because it was broad daylight and did not see what kind of gun Lil Kev shot, but it sounded like a revolver. Lil Kev then ran south down the sidewalk on Cottage Grove and Lil Kev tried to hide the gun by clutching the gun to his body."

¶ 26 ASA K. Peterson testified regarding Jones's testimony at the grand jury proceeding on April 30, 2009. ASA K. Peterson read portions of the transcript from that proceeding, at which Jones testified that he and Williams were talking near the gate to the parking lot on the day of the shooting, he turned to look at Williams and saw defendant walk up behind Williams and point a gun at his back, he saw fire jump out of the gun, and he had on prior occasions seen "Little Kevin" playing basketball in the area. ASA K. Peterson testified that she also spoke with Jones on April 27, 2009, but did not present him to the grand jury that day because his account did not match what was in his memorialized statement.

¶ 27 Eugene Ali testified that he had two felony convictions for possession of a controlled substance, one in 2002 and the other in 2003. He testified that on the day of the shooting, around 5 p.m., he walked to 62nd and Cottage Grove to an apartment complex to visit his friend, Shirley

Martin, who he had known for about seven years. Martin had a daughter, Regina, who had three children. Ali knew one of her children, Virgil, well. He also had known defendant for several years. On his way to her apartment, Ali heard a gunshot. A few minutes after, he saw Virgil and defendant run past him towards the apartment complex. He testified that they were running from north to south and they were talking to each other excitedly. While he was sitting on the steps of Martin's apartment, he heard from inside "a couple of excited boys, one asked the other one what did we do or something like that." He thought that it was Virgil who made the statement, but he was not certain. He testified that he did not stay at the apartment long because there were too many kids inside.

¶ 28    On April 24, Ali viewed a lineup at the police station and identified defendant as one of the individuals he saw after the shooting. At some point, he also identified defendant from a photo array. When shown a photo of the lineup, Ali testified that it was blurry. On April 27, 2009, Ali testified before a grand jury. He did not recall testifying that defendant stated, "what the hell did I do?" or that defendant was nervous, but he admitted that he must have if that is what the transcript said. Finally, Ali admitted that he did not want to testify and he had a contempt petition pending against him for failure to appear in court in this case.

¶ 29    On cross-examination, Ali testified that he had been drinking alcohol and using drugs on the day of the shooting, he did not see the shooting, he never saw defendant with a gun, and there were many people running in the area after the shooting. On redirect examination, he testified that Detective Maas did not ask if he was using drugs on the day of the shooting. He also testified that he was using drugs on the day he testified before the grand jury.

¶ 30    Detective Maas testified that Ali viewed a lineup and, from that lineup, Ali identified defendant as the person who ran past him after the gunshots.

¶ 31    Assistant state's attorney Jodi Peterson testified that, on April 27, 2009, she interviewed Ali regarding his knowledge of the April 2 shooting. Ali agreed to testify before the grand jury. ASA J. Peterson read to the jury portions of the grand jury transcripts, indicating that Ali previously testified that he thought defendant was nervous and sweating and he believed he heard defendant say, "Man, what the hell did I do?" ASA J. Peterson also testified that she did not believe Ali was under the influence of alcohol or drugs at the grand jury proceeding.

¶ 32    The parties stipulated that if called to testify, a medical examiner would state that she performed an autopsy of Williams, the cause of death was a gunshot wound to the back, and the manner of death was homicide. She would also state that Williams had a five-point star tattoo on his forearm, which Officer McClendon testified earlier would indicate that that person was a Black P-Stone. The parties also stipulated that a .32 caliber bullet was recovered from the autopsy.

¶ 33    The State rested, and defendant made a motion for a directed finding, which the trial court denied.

¶ 34    The defense called Davead McIntyre as a witness. He testified that, on April 2, 2009, he was living on Cottage Grove Avenue near 61st Street. Around the time of the shooting, he, Baker, and Ward were playing video games in his bedroom. Defendant was not there. He heard three or four gunshots and looked out the window. He observed the shooter, who was light-skinned, heavyset, and wearing purple clothing, running away from the area. He testified that he did not see the person actually firing a gun, but he did see a gun in his hand. McIntyre testified that he spoke to police a week after the shooting and he spoke with ASA K. Peterson on April 27. On both occasions, he provided a description of the shooter.

¶ 35    In rebuttal, the State presented ASA K. Peterson who testified that, when she spoke with McIntyre, he did not tell her that he looked out his window or that he saw a person with a gun

running away, and he also did not describe the shooter to her. She testified that she did not present McIntyre to the grand jury because he did not indicate to her that he had seen anything related to the shooting. Additionally, in rebuttal, Officer McClendon testified that he was present when Detective Maas spoke with McIntyre on April 20, and McIntyre never stated that he saw the shooter.

¶ 36   During jury deliberations, the jury requested copies of the memorialized statements generated by the assistant state's attorneys, the grand jury transcripts, and trial testimony transcripts, and informed the judge two separate times that they were at an impasse. The following morning, the jury found defendant guilty of first degree murder and that he personally discharged a firearm that proximately caused death.

¶ 37                              B. Posttrial Proceedings

¶ 38   On November 10, 2011, defendant filed a motion for a new trial, which the trial court denied.

¶ 39   On May 30, 2012, defendant was sentenced to 60 years' imprisonment.

¶ 40   On direct appeal, this court affirmed defendant's conviction and sentence, finding that the State presented sufficient evidence to support his conviction and that his sentence was proper. *People v. Watson*, 2014 IL App (1st) 121741-U. On April 29, 2016, defendant filed a postconviction petition, which we discuss later in this disposition. Subsequently, on March 25, 2020, the supreme court denied defendant's petition for leave to appeal but entered a supervisory order directing this court to vacate its judgment and consider the effect of recent supreme court opinions on defendant's sentencing claims. *People v. Watson*, No. 118409 (March 25, 2020). On January 11, 2021, this court vacated defendant's sentence and remanded the case to the circuit court "for a new sentencing hearing in compliance with *People v. Buffer*, 2019 IL 122327, *People*

*v. Holman*, 2017 IL 120655, and 730 ILCS 5/5-4.5-105." On February 24, 2022, following resentencing, the trial court imposed a sentence of 25 years. On December 19, 2023, this court vacated defendant's sentence and remanded to the circuit court to permit the State an opportunity to file a petition for adult sentencing under section 5-130(1)(c)(ii) of the Act (705 ILCS 405/5-130(1)(c)(ii) (West 2020)). *People v. Watson*, No. 1-22-0741 (Dec. 19, 2023) (summary order). Thereafter, the State filed a petition for adult sentencing, and on May 30, 2024, defendant was again sentenced to 25 years. Defendant's appeal from that judgment is currently pending in this court.

¶ 41 As noted earlier, on April 29, 2016, defendant filed a postconviction petition, which is the subject of this appeal. In his petition, defendant alleged, *inter alia*, that he was actually innocent based on newly discovered evidence. As additional supporting evidence, defendant attached affidavits from Kalvin Carter and Darnell Ball, both of whom witnessed the shooting and averred that someone other than defendant was the shooter.

¶ 42 Carter averred that, on the day of the shooting, he was standing in a parking lot on Cottage Grove Avenue. He observed, in a parking lot directly across from him, a group of people, including Lil Tommie (the victim), who was smoking a cigarette with an older male. He and Tommie were both members of the Black P-Stones. Carter observed a black male in a purple hooded sweatshirt approach Williams and shoot him in the back. He recognized the individual as "Trevell," a member of a rival gang, Gangster Disciples. Carter averred that he and Williams "shot at Trevell the day before because [they] were in a rival war." As everyone ran away from the area, Carter saw Lil Kevin (defendant) running away as well. Carter averred that he knows that defendant did not shoot Williams, but he did not help defendant sooner because he was "mad" and he "wanted someone to

go down" for Williams's murder. Carter eventually confided in his brother who was able to contact defendant, leading to this affidavit.

¶ 43     In Ball's affidavit, he averred that on the day in question he was at the bus stop on the corner of 62nd and Cottage Grove when Williams walked by. Williams informed Ball that he was going to hang out with some friends in the parking lot across the street. Ball observed Williams smoking a cigarette with an older man, as "a tall man with a dark colored hooded sweatshirt" approached Williams and shot him three or four times. As Ball was running away, he saw defendant. Ball averred that defendant was not the shooter. Later, Ball and defendant were both at Menard Correctional Center and Ball decided to sign an affidavit because he knew defendant had been wrongfully convicted.

¶ 44     Also attached to the petition was defendant's own affidavit. Therein, he averred that he was in the area where Williams was shot but he did not shoot him and he did not aid or abet the actual shooter in commission of that crime.

¶ 45     On March 20, 2017, the State filed a motion to dismiss the petition. On January 17, 2018, the trial court denied the State's motion as to the actual innocence claim, and the matter was advanced to a third-stage evidentiary hearing.

¶ 46                              C. Third-Stage Evidentiary Hearing

¶ 47     The evidentiary hearing took place over multiple days beginning on March 30, 2023. At the hearing, defendant presented five witnesses: Carter, Ball, Araell Ross, Regina Martin, and Virgil Peterson.

¶ 48     Carter testified that he was currently in the custody of the Illinois Department of Corrections (IDOC) at Hill Correctional Center for the offense of first degree murder. On April 2, 2009, he was 14 years old and was a witness to the shooting of Williams, who was his friend. On

that day, there were a number of people hanging out on Cottage Grove, including both Gangster Disciples and Black P-Stones. He testified that the person who shot Williams was wearing a purple hooded sweatshirt and he recognized the person as Trevell Martin. Carter knew Martin from "around the area." He testified that he believed the gun was a revolver but did not recall how many shots were fired. He further testified that he was about 20 feet away from the shooter. After the shooting, Carter ran home, which was about two blocks away. He testified that he did not call the police because he was raised not to do so.

¶ 49    He also testified that he recognized defendant as "Little Kevin" but they were not friends. He just knew him from the area. He testified that defendant was present the day of the shooting, but he was not involved. He testified that he was never contacted regarding the shooting.

¶ 50    Regarding his affidavit, Carter testified that he was in Menard Correctional Center at the time he signed it. He did not write the affidavit, but they were his words and he read it before signing. He was not forced or threatened to sign the affidavit. He testified that he "was not at liberty to say" who wrote the affidavit, but it was sent to him and he signed it. When asked why he signed the affidavit, he responded: "Because I felt like it was the right thing to do at this point." He further testified that he was angry about the murder of Williams and he wanted someone to "pay for it." However, after being convicted of murder himself, he realized that he did not want someone to be "convicted of something they didn't do." He further testified that defendant did not ask him to sign an affidavit, nor did he ask him to come forward with his information regarding the shooting.

¶ 51    Finally, Carter testified that investigators for the State spoke with him while he was in custody. They showed him an affidavit; however, he testified that it was not the same one as the one just discussed. He stated that it had his name on it, but it was not his signature. He also testified that the investigators only asked him about the affidavit, not about the shooting itself.

¶ 52 On cross-examination, he denied that he ever told anyone that he did not see the shooter. He also denied that he learned of Martin's connection to the shooting "from word of mouth on the street[.]" When asked on cross-examination why he could not say who wrote the affidavit, Carter testified that he had not been threatened and that "[i]t's just that I don't see the need to, you know, to mention that." When asked why he did not include a description of the shooter, he responded that he did not write the affidavit.

¶ 53 Ball testified that he was currently in IDOC custody at Pinckneyville Correctional Facility for his conviction for attempted murder. On April 2, 2009, at which time he was 16 years old, he was at the bus stop at 62nd and Cottage Grove when Williams walked up to him. He knew Williams's older brothers. They spoke briefly and then Williams walked across the street to a parking lot, where Ball observed him speak with an older man. He then saw a tall teenager walk up behind Williams and shoot him in the back. Ball testified that the gun was fired about three or four times. He did not know who the teenager was, but he was wearing a dark-colored hooded sweatshirt and Ball could see his face. He testified that that person was not in the courtroom, and he did not know that person's name. When the person started shooting, Ball ran away from the area and eventually went home.

¶ 54 Ball additionally testified that he saw defendant on the day of the shooting running away from the area. At the time, he was familiar with defendant, but he did not know defendant. He testified that defendant had a mohawk and was wearing a white T-shirt on the day of the shooting and he did not see him with a gun. Ball did not call the police after the shooting because he was taught not to get involved. He never spoke with police about the shooting. Ball was later in custody at Menard Correctional Center at the same time as defendant. At some point, he spoke with defendant about the shooting and asked if he could do anything to help him. Ball agreed to write

and sign an affidavit, and defendant did not threaten or pay him to do so. Ball was shown a photo at the hearing, and he testified that that was the shooter. The photo was not of defendant. When asked why he decided to come forward with his information now, he answered that he was older and was going through his own legal trouble and he could not imagine serving time for something that he did not do.

¶ 55    When investigators came to speak with Ball, he initially denied knowing anything because he thought he was a suspect in a murder. Eventually, he realized that they were asking about the 2009 shooting of Williams. He told the investigators that he witnessed the shooting, and he saw defendant run past him.

¶ 56    On cross-examination, he testified that the only description he could give for the shooter was that he was tall. He did not recall telling the investigators that he did not know who had been shot or that he had heard who had been shot on the news. He also did not recall saying that he only signed the affidavit out of sympathy for defendant. Ball further denied that defendant wrote the affidavit and that he refused to sign it until defendant wrote another one that was more in line with the truth. He also denied that he signed the affidavit and returned it to defendant by lowering it down to defendant's cell.

¶ 57    Ross testified that he was currently incarcerated for attempted murder. On April 2, 2009, he was 13 years old and he was at 61st and Cottage Grove in the parking lot. He was speaking with two girls and there were a few other people in the lot, including "Bud," Williams, defendant, and Martin. Ross described Martin as skinny and a little tall and wearing a "tannish brown hoodie." He observed Martin approaching Williams with a gun. At that time, Ross was about ten feet away from Martin and he could see his face even though his hood was "up a little bit." He saw Martin shoot a couple times at Williams's back from about one or two feet away. Ross saw Martin run

towards 62nd, so he ran in the other direction towards 61st. Ross told his parents about the shooting, but they did not want him to get involved. He never spoke with the police or any attorneys about the shooting.

¶ 58 In 2018, when he was incarcerated at Menard, his sister informed him that defendant was in custody there too for the murder of Williams. Ross reached out to defendant through other inmates to ask if he could help him. Ross, with the assistance of a law library worker, wrote an affidavit and signed it. He was not threatened or paid to write the affidavit. Ross was shown a photo, and he confirmed that it was a photo of Martin, who was the individual who shot Williams. Ross also testified that he knew Williams was a Black P-Stone and Martin was a member of Rock Creek, a faction of the Gangster Disciples. Ross additionally testified that he had the idea to provide defendant with an affidavit because he had pursued his own postconviction petition, which was denied because it lacked affidavits. On cross-examination, Ross acknowledged that his affidavit only identified Martin by his first name and did not include a description of the shooter.

¶ 59 Regina Martin (Regina) testified she, her children, including Virgil, and her mother, Shirley, were living at 6203 Cottage Grove Avenue on April 2, 2009. At the time of the shooting, she was asleep in her bedroom, but she remembered being startled awake by a couple of gunshots. She checked on Virgil, who was alone in his bedroom. She walked outside and learned that a young boy had been shot. She testified that defendant went to school with her son, but he was not at her home that day and she did not see him outside. Sometime after the shooting, a detective came to her home looking for Virgil and he informed her that the police were also looking for defendant. She testified that the police came to her home often to ask her about the shooting and at no point did she state that defendant and Virgil were together that day.

¶ 60 On cross-examination, Regina testified that she spoke to the police, but she did not recall ever signing a statement. She denied that she ever told the police that she saw Virgil running into their apartment. In January 2023, she was contacted by defendant's counsel and later went to counsel's office with her son, and there, she signed an affidavit. On redirect, she confirmed that counsel typed up the affidavit after they spoke together in private and she reviewed the affidavit before signing it.

¶ 61 Virgil Peterson (Virgil) testified he did not specifically recall April 2, 2009. He testified that he was asleep during the shooting and he did not hear any gunshots. At some point, he learned that someone was killed down the street from his home. He testified that he knew defendant from school, but they were not friends. He also knew Ali, who would visit his grandmother, Shirley, often, but he did not run past Ali on the way to his apartment that day. He further testified that the police came to his home multiple times after the shooting to question him. He went to the police station with his mother and his lawyer on one occasion, but he did not make a formal statement. When he went with his mother to counsel's office in January, he also spoke with counsel privately and signed an affidavit which she prepared based on their conversation. He testified that no one threatened or paid him to sign the affidavit. Finally, he acknowledged that he had been convicted of robbery and residential burglary.

¶ 62 On cross-examination, Virgil acknowledged that his affidavit said that he was in his room playing video games on the afternoon of the shooting. When asked if he saw his mother go outside after the shots were fired, he responded that he "was asleep" and he did not know. Counsel then asked: "You were asleep?", to which he responded: "I don't--I don't--I be in my room playing games, you know what I'm saying?" Virgil also testified that the police always told him to say that

defendant was the shooter or that he and defendant did it together. Virgil repeatedly informed the police that he did not know anything about the shooting.

¶ 63    The State called former Cook County State's Attorney Investigator Daniel Brannigan and State's Attorney Investigator Richard Lombard as witnesses.

¶ 64    Brannigan testified that, in 2016, he was assigned to conduct an interview with Carter. At the time, he was working with assistant state's attorney Cathi Dewald. On October 24, 2016, they both went to Menard to speak with Carter. After explaining who they were, Carter agreed to the interview and stated that he recognized his affidavit. No other affidavits were shown to him. Brannigan asked Carter to recount the events of April 2, 2009. Carter told them that he was hanging out on Cottage Grove near 62nd Street with a couple of friends, including defendant. A person approached and shot Williams, at which point everyone ran away. At the time of the interview, Carter could not remember how many gunshots he heard.

¶ 65    Following the interview, Brannigan wrote a report that included direct quotations from Carter, which were based on his notes, not his memory. When Carter was informed that his story conflicted with his affidavit, he stated, "what I told you was my truth." Carter told Brannigan that he did not know who the shooter was, specifically stating, "I didn't see no face." When asked how the affidavit came about, Carter replied that he and defendant were both incarcerated in the same place and they spoke about defendant's case. When asked about Trevell Martin, who he named as the shooter in the affidavit, Carter responded that it was "speculation" and that was the "word on the street."

¶ 66    Lombard testified that he, his partner James Stewart, and ASA Dewald went to Hill Correctional Center on November 10, 2016, to interview Ball. After introducing themselves, Ball agreed to speak with them. He was first asked, generally, whether he had witnessed any shootings,

to which he responded that he had not. When asked about this specific shooting, Ball answered that he was at the bus stop when he heard gunshots and saw people running away but he did not see the shooting. He also told them that he recognized defendant as one of the individuals running away from the area and he knew defendant because they dated the same girl. When shown the affidavit, Ball stated that it had his signature, but the affidavit was not true. Ball explained that he had come into contact with defendant at Menard and defendant asked him to sign an affidavit to help him. Ball was not comfortable with doing so but did it because he sympathized with defendant. He refused to sign the initial affidavit defendant gave him but signed a different one and lowered it down to defendant's cell. Ball further stated that he was not present when the affidavit was notarized. Lombard testified that Ball appeared anxious during the interview.

¶ 67     In rebuttal, defendant called Jennifer Cowan, who worked as a paralegal assistant at Menard in 2015. She did not recall if she came into contact with Ball. She explained that if an inmate asked to have something notarized, she would check that person's identification to make sure it was the actual person signing the document. She would then watch the person sign the document and notarize it. When shown Ball's affidavit, she testified that if it had her name on it, then she notarized it. Finally, she testified that she would never notarize something if she did not witness that person signing it and did not receive identification of the person.

¶ 68     On June 12, 2023, the trial court denied defendant's petition. In issuing its decision, the court discussed each of defendant's occurrence witnesses, stating that she "paid attention to how they testified in court, and then what they said, the reasonableness of the testimony, the demeanor as to how they testified." As to Carter, the court did not find his testimony "credible at all[,]" noting that Carter did not write the affidavit himself, and he claimed that the affidavit showed to him by the investigator was a different one. Additionally, the investigator testified that Carter was shown

the same affidavit as presented to the court and that Carter stated that it was speculation that Martin was the shooter, and he did not actually see the face of the shooter. As to Ball, the court stated that his testimony was impeached and not credible at all, especially where the investigator testified that Ball stated that he did not see the shooting and he only signed the affidavit because he sympathized with defendant. As to Ross, the court found his demeanor "quite telling because he did sit with his back [to her] for the most part." The court also pointed out that it was "interesting" that Ross's own postconviction petition had failed because of the lack of affidavits. As to Virgil and Regina's testimony, the court stated that "they basically testified that they never saw [defendant] at their house on the day of the shooting" and that testimony "would not make any sort of difference at the trial[.]" Finally, as to defense counsel's argument regarding the jury's deliberations at the trial, the court stated the following:

"I understand your argument, Ms. Massarello, that it took the jury a long time, but it was a hard case. There were four separate witnesses, they all testified to different things at trial, and they were all impeached by prior Grand Jury testimony, that the jury took their time with, and quite rightfully so. They were able to make the determinations of credibility, as a trier of fact has to do, and they came to their conclusion.

It did take them a long time, it was a hard case, and I understand your argument at that. You know, with this evidence from these witnesses, things may be different, but I don't find these witnesses credible at all in naming another shooter under the circumstances and how they testified and what their testimony was, so your petition is denied."

¶ 69    On July 10, 2023, defendant filed a motion to reconsider. On August 7, 2023, the trial court denied that motion.

¶ 70    This appeal followed.

¶ 71                                    II. ANALYSIS

¶ 72    On appeal, defendant argues that the trial court erred in denying his petition where the new evidence at the evidentiary hearing showing that he was not the shooter, when viewed against the original trial evidence, made it more probable than not that a jury would reach a different result at a new trial. Specifically, defendant asserts that his evidence was sufficiently conclusive where the evidence at his jury trial was closely balanced, there was no physical evidence tying defendant to the shooting, the jury deliberations lasted an extensive amount of time, and the jury indicated multiple times that they could not agree on a verdict. In response, the State contends that defendant's argument requires this court to substitute its own credibility determinations for those of the circuit court and should therefore be rejected. Additionally, according to the State, the circuit court had "a clear and rational reason for finding defendant's witnesses incredible, and therefore, unable to support his petition."

¶ 73    The Act provides a method for a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2022); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding in a noncapital case has three stages. *Id.* at 10. At the first stage, the postconviction court takes all well-pleaded factual allegations in the defendant's petition as true and must advance the petition to the second stage so long as the court finds that it stated the "gist" of a constitutional claim. *People v. Johnson*, 2021 IL 125738, ¶¶ 25-26. If the petition advances to the second stage, counsel is appointed to make any necessary amendments to the petition. *Id.* ¶ 27. The postconviction court again takes all well-pleaded factual allegations as true at this stage and advances the petition to the third stage if the court finds that the defendant has made a substantial showing of a constitutional violation. *Id.*

¶ 74    At the third stage, the defendant must demonstrate actual innocence by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. At the evidentiary hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence," and "may order [the defendant] brought before the court." 725 ILCS 5/122-6 (West 2022). Unlike the prior two stages, at the third stage, the trial court determines witness credibility, weighs testimony and evidence, and resolves evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. Significantly, in *Coleman*, our supreme court addressed the trial court's role at a third-stage evidentiary hearing, noting that it requires "a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* ¶ 97. The supreme court continued:

> "But the trial court should not redecide the defendant's guilt in deciding whether to grant relief. [Citation]. Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial. [Citation]. Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. [Citation]." *Id.*

Because the trial court is the factfinder and is in the best position to observe and weigh credibility, we review the trial court's decision for manifest error. *People v. Reed*, 2020 IL 1249940, ¶ 51. Manifest error is " 'clearly evident, plain, and indisputable.' " *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 75    "The conviction of an innocent person violates the due process clause of the Illinois Constitution." *Morgan*, 212 Ill. 2d at 154. To establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is newly discovered, material and not

merely cumulative, and of such a conclusive character that it would probably change the result on retrial. *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). New evidence is that which was discovered after the trial and could not have been discovered earlier through the exercise of due diligence. *Id.* Material evidence is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence is that which adds to what the factfinder heard at the trial. *Id.* Finally, conclusive means evidence, which when considered along with the trial evidence, would probably lead to a different result on retrial. *Id.* "[T]he new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 56 (citing *Coleman*, 2013 IL 113307, ¶ 97).

¶ 76    Here, the only issue on appeal is whether the new testimony of Carter, Ball, and Ross is sufficiently conclusive such that it would probably change the result upon retrial. Based upon our review of the record, giving deference to the trial court's credibility findings, we find that the court did not err in denying the petition. Stated another way, it is not clearly evident, plain, or indisputable that the trial court should have found the newly discovered evidence sufficiently conclusive to change the outcome on retrial.

¶ 77    In its ruling, the trial court found the testimony of Carter, Ball, and Ross not at all credible, and those findings are supported by the record. We will address each witness's testimony in turn.

¶ 78    Carter provided his account of the shooting and identified Martin as the shooter, not defendant. However, Carter admitted that he did not write his affidavit but refused to disclose to the court the writer's identity. He stated that he was "not at liberty" to say who wrote it. Hiding the source of the affidavit severely undermined Carter's credibility, and the court rightfully questioned the veracity of his testimony. Additionally, the State's investigator impeached Carter's testimony with his own prior statements. According to Brannigan, Carter never saw the shooter's

face and only named Martin as "speculation" based on the "word on the street." Carter also claimed that the investigator showed him a different affidavit than the one he received from a mysterious source and signed. We find that testimony implausible, as on these facts, we can perceive no rational basis for the investigator to do such a thing. Finally, when Brannigan pointed out the inconsistencies with his affidavit, Carter stated, "what I told you was my truth," suggesting that the account to Brannigan that he did not know the shooter was the truth, not his testimony at the hearing. On this record, we must agree with the trial court that Carter's testimony was not credible at all.

¶ 79    Similarly, Ball's testimony was largely impeached by prior statements made to the investigator. Ball testified that he saw the shooter's face and it was not defendant, but he was unable to provide any description of the shooter, other than that he was tall. He also claimed that he offered to write the affidavit on defendant's behalf. However, Lombard testified that Ball told him that he was in the area and heard the gunshots but did not see the shooting or the shooter. He also told Lombard that the affidavit shown to him, which he signed, was not true, and that defendant wrote the affidavit. Ball also informed Lombard that he was not present when the affidavit was notarized; however, Cowan, a paralegal assistant at the prison, testified that she would never notarize a document without proof of identification and witnessing that person signing it. She also testified that she was not familiar with Ball. Thus, despite testimony from three witnesses, it remains a mystery how Ball's affidavit came about. Like the trial court, we have little confidence in the credibility of Ball's testimony.

¶ 80    Finally, Ross testified that he witnessed Williams speaking with Jones and Martin shooting Williams in the back and running south on Cottage Grove. Unlike Carter and Ball, there was no impeachment by investigators. However, as to Ross, the trial court specifically noted his demeanor,

stating that he faced away from the judge throughout his testimony. A witness's tone, body language, or both "may have a profound effect on a fact finder's evaluation of [their] credibility, believability, or trustworthiness." Thus, the trial court rightly considered Ross's body language as indicative of his credibility, or lack thereof. See *People v. House*, 2023 IL App (4th) 220891, ¶¶ 89-91 (explaining "paralanguage" and its significance in assessing credibility of witnesses). Moreover, Ross admitted that his own postconviction petition failed because it was missing affidavits. Although we would not seek to fault Ross for understanding the legal requirements for postconviction proceedings, it is, as the trial court stated, "interesting."

¶ 81     Of course, we recognize, as the trial court must have at earlier stages in these proceedings, that, if the witnesses' accounts were true, then confidence in the jury verdict would be diminished and there would be a likelihood of a different result on retrial. However, "[a]t the third stage, the focus shifts to the quality and credibility of [the] alleged evidence, which is why the witnesses are required to testify in open court." *House*, 2023 IL App (4th) 220891, ¶ 93. Additionally, we owe deference to the trial court's credibility determinations because, as the trier of fact, it relies "heavily on the demeanor and paralanguage of the witnesses," which "are unavailable to the reviewing court," having only the cold record before it. *Id.* ¶ 89. This is especially significant here where the trial court made it clear that its findings were partially based on the witnesses' demeanor while testifying.

¶ 82     In this case, the record shows that none of the three witnesses were the least bit credible. None of the three came forward with their information until more than five years after the shooting, and all three were currently incarcerated for serious convictions at the time of the hearing. Ball's description of the shooter was vague. Carter and Ball did not maintain the same accounts when interviewed by the State's investigators, whom we have no reason to believe lack credibility. The

origins of each witnesses' affidavits are also murky at best. Thus, we find the trial court's credibility assessment of these three witnesses was reasonable. See *People v. Masters*, 2024 IL App (4th) 230370, ¶ 54 ("When evaluating a circuit court's assessment of witness credibility under the manifest error standard, the reviewing court considers whether the credibility assessment was reasonable.").

¶ 83 As to Virgil and Regina's testimony, defendant contends that their testimony directly refuted the testimony of Ali, who was the only witness to testify that defendant made an inculpatory statement. The State responds that it was "not manifestly erroneous for the circuit court here to see the clear biased motive for [Regina and Virgil's] testimony and find it incredible." We agree with the State.

¶ 84 It is true that Virgil and Regina's testimony directly refuted Ali's testimony that he saw defendant and Virgil run past him minutes after the shooting and heard one of them state "what the hell did we do?" They admitted that Ali was at their home often with Shirley Martin, but according to their testimony, Virgil was in his room alone before and after the shooting and at no point saw or was with defendant. Defendant ignores, however, that their testimony was also clearly self-serving in nature where Virgil had also been implicated in the murder by Ali's testimony. Where the evidentiary hearing could potentially result in a new trial, it would have been in Virgil's best interest to contradict Ali's testimony on the record as soon as possible and distance himself from defendant and any of the other witnesses to the shooting. This is supported by Virgil's own testimony that the police repeatedly came to his home to interrogate him regarding the shooting. Additionally, Virgil and Regina's testimony did not actually shed any light on the circumstances of the shooting or whether defendant was the shooter. Their testimony, therefore, would not have

been motivated by any desire to exonerate defendant, and the trial court rightfully gave it little weight.

¶ 85    Ultimately, defendant's actual innocence claim relied on the credibility of Carter, Ball, and Ross, and the trial court's finding that none of them were credible is amply supported by the record. Thus, the court's findings were not manifestly erroneous, and the denial of the petition was proper.

¶ 86    We also reject defendant's argument regarding the effect of the jury deliberations in this case. In particular, he contends that that the lengthy deliberations demonstrate the weakness of the State's evidence and, therefore, defendant's "new exculpatory testimony" would result in a different outcome on retrial. We recognize, as did the trial court, that the jury in this case had some difficulty in coming to its conclusion. However, according to the trial court's findings, with which we agree, defendant has not presented any credible evidence that would have altered the ultimate outcome. Without any new, *credible* evidence, there is no reason to conclude that the jury would come to a different conclusion upon retrial. See *People v. Bannister*, 2025 IL App (1st) 231399-U, ¶ 59 (stating that "[i]f the court finds that a witness is not credible, then it follows that the witness' testimony would not increase the likelihood of a different result on retrial"); Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023) (an unpublished order may be cited for persuasive purposes). In effect, defendant suggests that we should disregard the trial court's credibility findings. But, absent a showing of manifest error, we cannot.

¶ 87    He also argues that the trial court, when addressing the jury deliberations, expressly found that the new evidence would result in a different outcome. However, defendant is merely cherry-picking a portion of a sentence without considering the full context within which it was made. Our review of the record shows that the court acknowledged defense counsel's argument regarding the significance of the lengthy jury deliberations, but noted that, "rightfully so," the jury "took their

time" considering the testimony of the witnesses, made "the determinations of credibility, as a trier of fact has to do, and they came to their conclusion." The court then stated:

> "It did take them a long time, it was a hard case, and I understand your argument at that. You know, with this evidence from these witnesses, things may be different, but I don't find these witnesses credible at all in naming another shooter under the circumstances and how they testified and what their testimony was, so your petition is denied."

It appears to us that the trial court recognized the difficulty of the case and that the new witnesses presented additional testimony regarding the identification of the shooter, but their lack of credibility effectively negated its veracity. That is our understanding of the court's statements. In any case, there is not enough in those two sentences to affirmatively conclude that the court "misapplied the standard for conclusivity." See *In re Jonathan C.B.*, 2011 IL 107750, ¶ 72 (trial courts are presumed to know and apply the law unless the record affirmatively demonstrates otherwise). Rather, the court appropriately made its findings of credibility and concluded that, without credible evidence, defendant's petition could not be granted.

¶ 88    Finally, defendant relies on *People v. Johnson*, 2024 IL App (1st) 220494, for support. However, that decision was reversed and remanded by our supreme court on March 19, 2026 (*People v. Johnson*, 2026 IL 131337), and thus, we do not consider it.

¶ 89    As we have stated, following an evidentiary hearing, we will only disturb the court's judgment if it is manifestly erroneous. *Morgan*, 212 Ill. 2d at 155. We agree with the trial court that defendant's new evidence is wholly lacking in credibility and, thus, we conclude that it does not "undercut[ ] the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. Because there is no manifest error in the court's decision, we affirm the denial of defendant's postconviction petition.

¶ 90                                    III. CONCLUSION

¶ 91     For the reasons stated, we affirm the judgment of the circuit court.

¶ 92     Affirmed.