2026 IL App (1st) 242113-U

FIFTH DIVISION
June 5, 2026

No. 1-24-2113

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2021 CR 0784001 |
| | ) | |
| MICHAEL GRACIA, | ) | Honorable |
| | ) | Aleksandra Gillespie, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's attempted first degree murder convictions are affirmed. The evidence sufficiently established his guilt beyond a reasonable doubt, and his counsel was not ineffective for failing to object to out-of-court statements made by his codefendant, where it was presumed that the trial judge considered that evidence only in the codefendant's severed but simultaneous bench trial.

¶ 2    Following a bench trial, defendant Michael Gracia was convicted on two counts of attempted first degree murder and sentenced to concurrent terms of 31 years and 26 years in prison. Mr. Gracia argues on direct appeal that (1) the State's evidence was insufficient to prove his guilt

beyond a reasonable doubt, and (2) his trial counsel was ineffective for failing to object to the admission of text messages sent by his codefendant that were inadmissible hearsay in Mr. Gracia's case. We are unpersuaded on both grounds and affirm Mr. Gracia's convictions.

¶ 3                                    I. BACKGROUND

¶ 4     The State charged Mr. Gracia by indictment with nine counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2020)), one count of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and two counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), charges all stemming from shots fired from a truck at two individuals, Sergio Cabral and Miguel Sierra, on January 16, 2021. Mr. Gracia and his codefendant, Nicholas Athans, were tried in severed but simultaneous bench trials, beginning on November 6, 2023, with the State proceeding against Mr. Gracia as the principal and against Mr. Athans, not a party to this appeal, on a theory of accountability. The evidence at Mr. Gracia's trial was as follows.

¶ 5                         A. The State's Eyewitness Testimony

¶ 6     While another witness, Evelyn Hernandez, saw the shooting from her living room window, she could only identify the truck. She also provided evidence that the front driver's side window of her own vehicle, a black PT Cruiser parked in front of her building, had been shot out and that there was a bullet lodged in the steering column. Only the two victims, Mr. Cabral and Mr. Sierra, saw inside the truck and made any identification of the driver or the passenger or testified as to which of them was the shooter.

¶ 7                                    1. Sergio Cabral

¶ 8     Sergio Cabral testified that on January 16, 2021, he was living at 5312 West Oakdale Avenue with his roommate, Miguel Sierra. He had worked 14 or 15 hours that day helping his friend, Nicholas (Nick) Athans, who operated a towing business. He and Mr. Athans, whom he

identified in court, had been friends for many years and considered each other family. When they were done for the day, they parked near the tow yard and "drank [a] little bit," each of them having a pint or pint-and-a-half of cognac. Mr. Athans was emotional because it was the anniversary of his father's death. Around 6 or 7 p.m., Mr. Cabral asked Mr. Athans to drive him home, and Mr. Athans became angry, saying Mr. Cabral was not his friend because he didn't want to stay out with him. Eventually, though, he agreed to take Mr. Cabral home.

¶ 9    Ten or fifteen minutes later, Mr. Cabral began receiving phone calls, pictures, and text messages from Mr. Athans. Mr. Athans was "talking sh***," saying that Mr. Cabral "wasn't his real family," that "he was with his real family," and that he was coming back to Mr. Cabral's apartment. He then sent Mr. Cabral a selfie photo of himself "giving the finger" to the camera. In this photo, Mr. Gracia, whom Mr. Cabral identified in court, appears next to Mr. Athans smiling. Mr. Cabral did not know Mr. Gracia's name at the time but recognized him from social media.

¶ 10    Mr. Cabral showed the photo to his roommate, Mr. Sierra, and asked him to come outside and "watch [his] back." The two went outside, and the tow truck soon came around the corner and pulled up in front of the building, with its passenger side closest to Mr. Cabral. The windows were rolled down, and Mr. Cabral could "kind of but not really" see inside. Mr. Athans was in the driver's seat and Mr. Gracia was in the passenger seat. Mr. Cabral approached the truck and, when he was about two feet away, saw a flash of light from the passenger window and blacked out.

¶ 11    Mr. Cabral acknowledged that he had a gun in his jacket pocket when he approached the tow truck but denied pulling it out or pointing it at anyone. He testified that he brought it "just in case" because he didn't know what Mr. Athans and Mr. Gracia were planning to do. He knew Mr. Athans sometimes carried a gun, but he did not expect to be shot at as he approached the tow truck. On cross-examination by Mr. Athans's attorney, Mr. Cabral identified a video of himself holding

a gun and pointing it at the camera. He explained that it was an old video, created on some other date, but agreed that he had sent it to Mr. Athans during the exchange they had on the night of the shooting. The video was entered into evidence and adopted as an exhibit by Mr. Gracia's counsel.

¶ 12    Mr. Cabral testified that the next thing he remembered was waking up from a coma in the hospital and thinking he was dying. He had been shot in the face and leg and spent seven months in the hospital and three more in rehab, undergoing a total of three surgeries. "I actually had to learn to walk, talk and everything all over again," he explained. "I had to wear a diaper like a baby." He still suffered from nerve pain, muscle spasms, and migraines, and had lost nine teeth.

¶ 13    Mr. Cabral met with detectives twice in his hospital room. The second time, on February 2, 2021, he was shown a photo array. Because he could not yet write, he verbally indicated which of the photos included in the array showed someone he recognized. Mr. Cabral circled that photo in the unmarked array at trial, identifying it as a photo of Mr. Gracia. When asked what he told the detective who administered the array about that person, Mr. Cabral said, "I don't recall." He did remember, however, telling the detective that that person was the passenger of the tow truck.

¶ 14    The State showed Mr. Cabral a video the detectives had taken, and he testified that it was a true and accurate depiction of the photo array being administered to him in the hospital. He added, however, "I honestly don't kind of remember that." He explained that although his memory continued to get better, there were still some aspects of his time in the hospital that he could not remember very well. In the video, which this court has reviewed, Mr. Cabral identifies the photo of Mr. Gracia as the person who "shot [him] in the face."

¶ 15    Mr. Cabral acknowledged that he had met with Mr. Gracia's attorney about a year before trial—almost two years after viewing the photo array—and at that meeting signed an affidavit stating:

4

"I told the Police the passenger shot me because I did not want to get Nicholas in trouble, and I had seen his [the passenger's] picture in those texts. I really did not know or see who shot me. When I made the identification in the hospital I was on a lot of medication and in a lot of pain and really confused. I did not see the passenger of the truck shoot me."

Mr. Cabral testified that he wrote the affidavit by hand and read and signed a version of it that was typed up by Mr. Gracia's counsel.

¶ 16    At trial, however, Mr. Cabral testified that he did not remember making the statements contained in the affidavit. When asked by the State if he was ever worried about getting Mr. Athans in trouble, Mr. Cabral said, "Yes and no." On the one hand, "[n]ot really, because he shot me," but "yes, because he knows a lot of people and stuff." What he had said in the affidavit was true "in a way" because all he saw when he stepped from the curb were the two people in the front seat and a flash before he blacked out. "Nick obviously didn't shoot me," he explained, "if he was on the driver's seat." When asked if he observed Mr. Athans moving around in his seat or saw a flash coming from the driver's side of the tow truck, however, Mr. Cabral seemed unsure, explaining that it "happened so fast," and he "[didn't] even know what [wa]s what anymore."

¶ 17    On cross-examination by Mr. Gracia's counsel, Mr. Cabral agreed that he had a 2016 felony conviction for robbery, for which he spent five years in prison; a 2013 conviction for attempted burglary or attempted robbery; and a 2012 conviction for possession of a controlled substance, for which he was sentenced to probation. He maintained that he was not drunk on the night in question, only tired, having stayed up the whole night and the following day towing cars.

¶ 18    Mr. Cabral also agreed on cross-examination by Mr. Gracia's counsel that he did not actually see a gun in Mr. Gracia's hand. "You don't know who fired that gun at you, do you?" counsel asked, and Mr. Cabral said, "No, I don't." When asked if it could have been Mr. Athans,

Mr. Cabral said, "I don't know. I don't know how to answer that question." When asked why he had identified Mr. Gracia in the photo array as the person who shot him, Mr. Cabral said, "it is like I got vision [*sic*] that I seen like, you know, I could have sworn I seen, just I don't know, I don't even know. Lord, help me; Lord, help me." When pressed by counsel on whether, as he had stated in his affidavit, he had told the police that the passenger shot him because he did not want to get Mr. Athans in trouble, Mr. Cabral said, "Yes."

¶ 19    On cross-examination by Mr. Athans's counsel, Mr. Cabral was asked about certain text messages he received from Mr. Athans after the shooting, which counsel wanted to introduce to rebut the notion that Mr. Athans was angry with Mr. Cabral on the night of the shooting. The State objected to the messages as hearsay, and the court sustained the objection.

¶ 20    On redirect examination, the State asked Mr. Cabral to explain why he believed it was the passenger who had shot him. "I said that," he explained, "because I went to the passenger seat. From my memory, I remember was [Mr. Athans] driving, and passenger was him [indicating Mr. Gracia]." He said, "I seen the flash, what I believe came from passenger or like inside the car basically." Mr. Cabral agreed that he had not wanted to come to court to testify at the trial in part because he was afraid. When asked to explain, he said, "It's [j]ust a small world out there," "everybody knows each other," and "[g]rudges [are] always going to be held."

¶ 21                                2. Miguel Sierra

¶ 22    The State then called Miguel Sierra. Mr. Sierra testified that on January 16, 2021, he and Mr. Cabral had been friends for three or four years. Mr. Cabral was Mr. Sierra's roommate, sleeping on the sofa in the living room of Mr. Sierra's apartment. Mr. Cabral had been out working with a friend who ran a towing business, something he did on occasion, and Mr. Sierra had spent the day drinking and watching football. When Mr. Cabral arrived home that evening, Mr. Sierra

6

heard him get into an argument with someone over the phone and become agitated.

¶ 23　When asked what happened next, Mr. Sierra said, "Nothing. We went outside for a minute, and he got shot." Mr. Sierra heard Mr. Cabral arguing with someone and heard three or four shots, but he ducked behind a car—which he identified from a photograph as Ms. Hernandez's PT Cruiser—as soon as the tow truck pulled up and so "didn't see nothing." He could not describe the tow truck because it was dark out, and he could not recall if it had marks on the side of it because he was drunk. When it drove off, Mr. Sierra came out from behind the car and saw Mr. Cabral lying in the street. He tried to call the police and then decided to retrieve from Mr. Cabral's person a small amount of marijuana that the two of them had purchased earlier and take it inside. When he came back out, a crowd had gathered, and the police were soon there.

¶ 24　On cross-examination, Mr. Sierra agreed that both he and Mr. Cabral had been drinking and smoking marijuana that night. Mr. Sierra explained that he had left the house first, to speak to the friend of a neighbor whom he saw outside, and Mr. Cabral walked out behind him. Mr. Sierra did not see Mr. Cabral with a gun that night but knew that he had one. He did not recall Mr. Cabral briefly returning to the apartment after stepping outside, but when shown footage from the neighborhood surveillance camera, he agreed that that was what it showed.

¶ 25　When asked by the State if he had talked to the responding officers about what he saw that night, Mr. Sierra said, "Don't really remember. I was drunk." He went on to deny ever willingly speaking to the police during their investigation. Although he spoke to them at the police station on January 21, 2021, he insisted, "I had no choice, like I had no choice to come to court right now." Mr. Sierra remembered being shown a photo array, which was entered into evidence, and identifying Mr. Athans as Mr. Cabral's boss, but insisted that he had not identified him as the driver of the tow truck on the night of the shooting and certainly had not identified the shooter. "I

picked out his boss. But I didn't pick out the guy that shot him. Never that."

¶ 26    Mr. Sierra agreed, as a video recording of the photo array being administered shows, that he identified Mr. Athans as "the owner of the tow truck" and "the one that brought the guy when my brother got—when my buddy got shot." He agreed, as the video further shows, that during the photo array he specifically identified Mr. Athans as the driver when the shooting occurred, saying "Yes, sir, I will never forget that face," and "I know for a fact that was him." Mr. Sierra explained away those statements by maintaining that he had again been drunk. "Let's just say for a month after the shooting, right, yeah, I was intoxicated. I didn't really sleep. Traumatized. All that."

¶ 27    Mr. Sierra agreed that, with Detective Jennifer Westerkamp present with him at the police station, he participated in a videoconference on February 4, 2021, with assistant State's attorney (ASA) Nora Carlson, during which she asked him about what had happened on the night of the shooting, but he again claimed to have been drunk. He agreed that during that interview he identified a person in a photo array as the driver of the tow truck on the night of the shooting but insisted at trial that he only meant he knew that was Mr. Cabral's boss at the towing company, reiterating that he had not seen either the driver or the passenger on the night of the shooting. If he told the ASA that he saw the driver while crouching behind the parked car, then that "was definitely wrong." "[T]here's no way in the world that I looked up," he insisted. "I didn't play peek-a-boo, none of that. Why would I do that while they were still there." He acknowledged that he told ASA Carlson he was not under the influence of drugs or alcohol, but said, "[a]n alcoholic is going to tell you what you want to hear."

¶ 28    We have reviewed the video, which is approximately 15 minutes long, and in it Mr. Sierra is cooperative and talkative, showing no signs of intoxication. He provides a detailed account of what took place on the night of the shooting, describing the tow truck as a white tow truck with

the overhead lights activated and "24" clearly visible on the side. Mr. Sierra identifies Mr. Athans from the photo array shown to him on January 21, 2021, and makes clear to the detective and ASA that Mr. Athans was the person who was in the tow truck's driver's seat. Mr. Sierra states that he was standing next to the passenger side of Ms. Hernandez's car when he heard the shots. He ducked down but still had "clear eyesight of the driver." He then states, "the passenger, that was shooting, I'm not trying to look at that dude right now." According to Mr. Sierra, three shots were fired at Mr. Cabral. The tow truck then moved forward and stopped again, Mr. Sierra ducked back behind the car, and another shot was fired in his direction.

¶ 29    Mr. Sierra agreed on cross-examination that even in the videotaped interview he said his view of the passenger had been obstructed. When asked if he had ever seen Mr. Gracia before trial, he said, "[n]ever," and when asked if he had seen Mr. Gracia shoot anyone, he said, "[n]ot really."

¶ 30                         B. Physical, Documentary, and Video Evidence

¶ 31    The parties stipulated that, if called as a witness, evidence technician Paul Habiak would testify that he arrived at the scene at approximately 9:22 p.m. on January 16, 2021. He collected four fired cartridge casings found in the street and a fifth found the following day inside a black PT Cruiser. Marc Pomerance, an expert in firearms and tool mark identification, examined the casings and concluded that they had all been fired from the same firearm.

¶ 32    The parties, including counsel for both Mr. Gracia and Mr. Athans, further stipulated that Chicago police officer Alkesh Shah would explain how he successfully extracted electronic data from two cell phones belonging to Mr. Cabral. The State introduced into evidence a summary of texts, calls, and video calls made between those phones and a contact called "Nick Chz Ball," a video Mr. Cabral said he had posted to Snapchat on the day of the shooting that showed Mr. Athans wearing an orange sweatshirt, and the selfie photo Mr. Cabral identified as the one sent to him by

Mr. Athans in which Mr. Gracia can be seen next to Mr. Athans, who is "giving the finger."

¶ 33    The parties also stipulated to the authenticity of footage from several Police Observation Devices (PODs) stationed along Belmont Avenue, as well as from several residential surveillance cameras located at homes on the 5300 block of West Oakdale.

¶ 34    Detective Jennifer Westerkamp testified that she was assigned to investigate the shooting. When she arrived, she spoke to officers, canvassed the area for witnesses, and reviewed footage from residential surveillance cameras. That footage, which was played at trial, shows a tow truck pull up along West Oakdale, a one-way street with cars parked on both sides, and a person identified by the detective as Mr. Cabral exits the residence and approaches the truck while another person, identified as Mr. Sierra, stands in the grassy area. The truck then pulls away, and Mr. Cabral can be seen lying in the street. That footage includes no audio. Footage from two other nearby residences does not show the tow truck, but two gunshots can clearly be heard, followed by a pause and three more shots. Detective Westerkamp reviewed POD footage from that night, also played at trial, which shows a tow truck, driven by an individual wearing clothing with an orange sleeve, travelling rapidly toward the scene and disregarding a traffic light.

¶ 35                      C. Police Testimony About Statements From the Witnesses

¶ 36    Detective Westerkamp testified that she spoke to Mr. Sierra on the night of the shooting, and he appeared both intoxicated and distraught. He told her that the tow truck had the number "24" on the side of it. On cross-examination, Detective Westerkamp agreed that in the notes she took of that interview she wrote only that Mr. Sierra "heard shots," but she explained on redirect by the State that the notes were not meant to be comprehensive—she used them, along with her own memory of the conversation, to generate her written report, where she stated, "Sierra related Cabral and the males in the tow truck were arguing at which time the passenger of the tow truck

10

fired shots at Cabral and then at Sierra before fleeing the scene."

¶ 37    Detective Westerkamp then went to Illinois Masonic Hospital to check on Mr. Cabral, learned that he was in a medically induced coma, and took possession of the cell phone that was found on his person. The following day, she inspected the tow truck, found parked and unoccupied, and spoke to Mr. Cabral's sister, who had located a second cell phone belonging to him.

¶ 38    On January 21, 2021, Detective Westerkamp contacted Mr. Sierra for a follow-up interview at the police station. Mr. Sierra related that he had no transportation, and Detective Westerkamp agreed to pick him up and drive him to the station. The first part of that interview was not recorded, but another detective was present, and there was no indication that Mr. Sierra was intoxicated. Mr. Sierra said that a white male was driving the tow truck on the night of the shooting and he believed that person was the owner of the tow truck and the person whom Mr. Cabral had been working with that day. Mr. Sierra said that it was the passenger who had fired the shots, but he did not see who that person was. Detective Westerkamp again did not include this information in her notes of the conversation but did include it when she generated her full report.

¶ 39    Detective Eddie Galloza testified that he served as the independent administrator of a photo array shown to Mr. Sierra that day. He also testified that Mr. Sierra did not appear intoxicated. Mr. Sierra was presented with and signed the advisory form and agreed to have the photo array videotaped. Detective Westerkamp later viewed that footage, along with the photo of the individual that Mr. Sierra had identified as the driver of the tow truck on the night of the shooting. The detective recognized that individual as Mr. Athans, whom she identified in court.

¶ 40    Detective Westerkamp visited Mr. Cabral again in the hospital on January 26, 2021. He was lying in a hospital bed, with a breathing tube that prevented him from speaking, and could not move his arms or legs, though he appeared alert and awake. The nurses explained that he could

understand her questions and "either blink his eyes or mouth the words yes or no." Proceeding in this manner, the detective was able to learn that Mr. Athans was involved in this incident, that it was not him but the passenger that had fired the gun, and that Mr. Cabral did not know the name of that person but had seen him before. Mr. Cabral then tried to say something else, but the detective could not understand him, except for the word "phone." The interview was videotaped, and a copy of the recording was admitted into evidence.

¶ 41    The detective spoke to Mr. Cabral again three days later, on January 29, 2021. He was able to speak but still had a breathing tube in his throat, making his sentences "short and abrupt." He confirmed that Mr. Athans had been driving the tow truck. He was still unsure of the name of the passenger but said that person had worked with Mr. Athans before, and he would be able to identify him. Detective Westerkamp then took a video while another detective administered a photo array. Mr. Cabral agreed to the advisory form verbally, not being able to sign it, and, by describing the location of the photo rather than pointing, he identified the photo of Mr. Gracia, whom Detective Westerkamp identified in court, as the tow truck's passenger.

¶ 42    A photo array that included a photo of Mr. Gracia was prepared and administered by a different detective to Mr. Sierra on February 4, 2021, and he was unable to identify anyone from that group of photographs as the passenger of the tow truck. Mr. Sierra agreed that same day to a videotaped interview, with Detective Westerkamp sitting next to him and an ASA asking him questions by Zoom. He did not appear to Detective Westerkamp to be intoxicated.

¶ 43    Detective Westerkamp also reviewed the data and files that were extracted from Mr. Cabral's cell phones. They included a short video he had posted to Snapchat earlier on the day of the shooting and the selfie photo of Mr. Athans and Mr. Gracia that Mr. Athans had sent to him just before the shooting. In both the video and the photograph, Mr. Athans appears to be wearing

an orange hooded sweatshirt and a blue vest.

¶ 44    On cross-examination by counsel for Mr. Athans, Detective Westerkamp was asked about a series of text messages sent by Mr. Athans to Mr. Cabral shortly after the shooting and over the next two days. In the messages—this time referred to substantively with no objection by the State—Mr. Athans repeatedly expresses his disbelief over what happened, his love for Mr. Cabral ("I love you, bro, OMG, WTF."), and his desire for Mr. Cabral to contact him ("Serg, please, bro, please call me, bro, OMG, bro, like a bad dream. My brother, please, bro. We have to talk, bro.").

¶ 45                    D. The End of Trial and Sentencing

¶ 46    The State rested, and the court denied Mr. Gracia's motion for a directed finding. Mr. Gracia introduced into evidence the affidavit Mr. Cabral had signed at defense counsel's office and a certified abstract showing that a firearm owner's identification (FOID) card held by Mr. Athans since 2012 had been revoked a year before the shooting in this case. He then rested.

¶ 47    Following argument and a continuation for the court to review the transcripts, the trial court found Mr. Gracia guilty on all counts. It explained that Mr. Cabral had identified Mr. Gracia as the passenger of the tow truck, and Mr. Sierra had identified the passenger as the shooter. In the court's view, the affidavit that Mr. Cabral signed at defense counsel's office "trie[d] to confuse the situation as to who the shooter [wa]s and [wa]s not credible." The evidence established that Mr. Gracia had intended to shoot and kill both Mr. Cabral and Mr. Sierra because he shot Mr. Cabral in the face at close range and then again in the leg, and separately fired shots at the car Mr. Sierra was hiding behind after the tow truck had pulled forward slightly.

¶ 48    The court denied Mr. Gracia's posttrial motion,  merged the lesser charges into two counts of attempted first degree murder, and sentenced Mr. Gracia to concurrent terms of 31 years in prison for the attempted murder of Mr. Cabral and 26 years in prison for the attempted murder of

Mr. Sierra. Mr. Gracia now appeals.

¶ 49                                    II. JURISDICTION

¶ 50    Mr. Gracia was sentenced on October 16, 2024. He filed a notice of appeal the same day

and a second one on October 23, 2024. We have jurisdiction under article VI, section 6, of the

Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb

6, 2013) and 606 (eff. Apr. 15, 2024), governing appeals from final judgments in criminal cases.

¶ 51                                    III. ANALYSIS

¶ 52    Mr. Gracia argues his convictions must be reversed because (1) the State's evidence was

insufficient to prove his guilt beyond a reasonable doubt, and (2) his counsel was ineffective for

not objecting to text messages sent by his codefendant on the grounds that they were inadmissible

in Mr. Gracia's case. We consider each argument in turn.

¶ 53                         A. Sufficiency of the State's Evidence

¶ 54    It is the State's burden to prove each element of an offense beyond a reasonable doubt.

*People v. Gray*, 2017 IL 120958 ¶ 35 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16, (1979)).

Here, Mr. Gracia was convicted on two counts of attempted first degree murder. A person commits

that offense when, with the intent to commit murder, he or she takes a substantial step toward

doing so. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 54 (citing 720 ILCS 5/8-4(a), 9-1(a)(1)

(West 2014)). A specific intent to kill is a necessary element, but it may be inferred from the act

of firing a gun at another person. *Id.*

¶ 55    Mr. Gracia makes two sufficiency arguments on appeal: (1) that the State failed to prove

he was the shooter, and, alternatively, (2) that it failed to prove he specifically intended to kill Mr.

Sierra. He also argues, and we agree, that his convictions cannot alternatively be upheld on a theory

of accountability, *i.e.*, that Mr. Athans was the shooter and he was legally accountable for Mr.

14

Athans' conduct. The State has not made that argument. Nor could it. A defendant "has a constitutional right to defend against the theory of guilt upon which he was *actually* convicted and sentenced" (emphasis in original) (*People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 149), and "[t]he State cannot raise a new theory of the case on appeal" (*People v. Homes*, 274 Ill. App. 3d 612, 623 (1995)). Because Mr. Gracia was charged, tried, and convicted as the principal in this case, we consider the sufficiency of the evidence supporting his convictions under that theory.

¶ 56    The law governing such challenges is well established. "The relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322 (2005). As the reviewing court, we do not retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. Rather, "it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* We will find the evidence insufficient only where it is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 57                    1. Whether the State Proved Mr. Gracia Was the Shooter

¶ 58    The State's case against Mr. Gracia hinged on the eyewitness testimony of the victims, Mr. Cabral and Mr. Sierra. At trial, Mr. Cabral identified Mr. Gracia as the passenger of the tow truck on the night of the shooting. Although Mr. Cabral did not see Mr. Gracia fire the gun at him, he believed Mr. Gracia was the shooter because the flash he saw just before he passed out came from the passenger side of the tow truck. Mr. Cabral agreed that video footage taken by the detectives in the hospital accurately depicted him identifying Mr. Gracia, though he acknowledged that he did not independently remember it.

¶ 59    We are not required to disregard this evidence, as Mr. Gracia urges, because, approximately

two years after the shooting, Mr. Cabral signed an affidavit in defense counsel's office stating that he had identified the passenger as the shooter because he "did not want to get Nicholas [Mr. Athans] in trouble," that he "really did not know or see who shot [him]," and that when he made the identification in the hospital he "was on a lot of medication and in a lot of pain and really confused." When confronted with that affidavit at trial, Mr. Cabral equivocated as to its accuracy. When questioned by the State, he claimed that he never said those things. But when asked on cross-examination if he had "told the police that the passenger shot him because he did not want to get Mr. Athans in trouble," he said, "Yes." On redirect, he maintained that he still believed Mr. Gracia had shot him, because the flash came from the passenger side of the tow truck.

¶ 60    As to Mr. Sierra, in a videotaped photo array administered at the police station on January 21, 2021, he identified Mr. Athans as "the owner of the tow truck" and "the one that brought the guy when my brother got—when my buddy got shot." He specifically identified Mr. Athans as the driver when the shooting occurred, saying "Yes, sir, I will never forget that face," and "I know for a fact that was him." In a videotaped interview with Detective Westerkamp and ASA Carlson on February 4, 2021, he again identified Mr. Athans as the driver on the night of the shooting.

¶ 61    According to Detective Westerkamp, Mr. Sierra told her on at least two occasions—on the night of the shooting and during the interview at the police station that preceded the photo array he viewed on January 21, 2021—that the passenger of the tow truck was the shooter. She acknowledged that Mr. Sierra was drunk on the night of the shooting, but she, the detectives who independently administered him the photo arrays, and ASA Carlson all testified that he gave no indication of being intoxicated any of the other times he was questioned. We have reviewed the videotaped January 21, 2021, photo array and February 4, 2021, interview, and in both Mr. Sierra appears alert, cooperative, and talkative.

¶ 62    In our view, a reasonable trier of fact could conclude, as the trial judge did here, that Mr. Gracia was the shooter. The court credited both Mr. Cabral's testimony that Mr. Gracia was the passenger of the tow truck and Mr. Sierra's statements to Detective Westerkamp that the passenger was the shooter. The court specifically found that the affidavit Mr. Cabral signed in defense counsel's office was not credible and rejected Mr. Sierra's claimed lack of memory and continuous drunkenness, believing instead what he told the detectives and ASA during their investigation.

¶ 63    Mr. Gracia urges us to disregard these credibility determinations and conclude for ourselves that the eyewitness's identifications were unworthy of belief. In support of this argument, he relies heavily on *People v. Johnson*, 2024 IL App (1st) 220494, *rev'd* 2026 IL 131337, in which a divided panel of this court reversed a conviction under somewhat similar circumstances. The majority concluded, based on the factors set out in *Neil v. Biggers*, 409 U.S. 188 (1972), that eyewitness identifications of the defendant as the shooter were unreliable and therefore insufficient evidence on which the jury could have found the defendant guilty beyond a reasonable doubt of murder. *Johnson*, 2024 IL App (1st) 220494, ¶ 69.

¶ 64    The so-called "*Biggers* factors" are: (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness'[s] degree of attention," (3) "the accuracy of the witness'[s] prior description of the criminal, (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200. Mr. Gracia argues that, where a conviction rests primarily on eyewitness testimony, our consideration of these factors amounts to a sort of "heightened scrutiny" sufficiency analysis.

¶ 65    As the supplemental authority we permitted the State to file following briefing in this appeal makes clear, however, this court's opinion in *Johnson* is no longer good law. Shortly after

briefing here was complete, our supreme court reversed this court's decision in *Johnson* and remanded for consideration of the defendant's other argument on appeal. *People v. Johnson*, 2026 IL 131337, ¶ 104. The *Biggers* factors, it explained, were formulated to evaluate the likelihood of a misidentification so that a court could decide the *admissibility* of an eyewitness identification. *Id.* ¶ 69. Although those factors are also relevant when this court decides whether the evidence at trial was sufficient to support a conviction, they cannot be used to expand our standard of review beyond the narrow question of whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* ¶ 72. Although the appellate majority in *Johnson* had cited that standard, our supreme court concluded that it had effectively, and improperly, reviewed the identification evidence in that case *de novo*. *Id.* ¶ 85.

¶ 66    Mr. Gracia points out that here, as in *Johnson*, the events of the shooting unfolded quickly, giving the eyewitnesses little time to make a positive identification, and that Mr. Sierra, like two of the witnesses in *Johnson*, did not have a clear line of sight because he was crouched behind a car. *Johnson*, 2024 IL App (1st) 220494, ¶¶ 33-35. He suggests that the degree of attention Mr. Cabral and Mr. Sierra had at their command, like the eyewitnesses in *Johnson*, was compromised by the fear and stress of the situation. *Id.* ¶¶ 39-44. And he asserts that the accuracy and level of certainty of their prior identifications was also called into question, as with two of the witnesses in *Johnson*, by their recantations and equivocations at trial. *Id.* ¶¶ 47-48, 55-56. The only *Biggers* factor that weighed in the State's favor, Mr. Gracia argues, is the length of time between the crime and the positive identifications, which was relatively short both here and in *Johnson*. *Id.* ¶¶ 58-59.

¶ 67    The State counters that Mr. Cabral, standing at the passenger window of the tow truck, and Mr. Sierra, standing just a few feet away, in fact had an excellent opportunity to observe the tow truck and its occupants. They would both have been paying a high degree of attention, as they were

concerned that there was going to be trouble. Mr. Cabral was certain, although he did not know the passenger's name, that it was the same person in the selfie picture that Mr. Athans had sent him, a person he was familiar with and whom he was sure he could identify, which he later did. And, although Mr. Sierra could not identify the passenger, his videotaped interview shows that he clearly and confidently identified Mr. Athans as the driver of the vehicle—contradicting his testimony at trial that he could not see anything because it was too dark and could not remember anything because he was too drunk—and the passenger as the person "that was shooting." That is consistent with what Detective Westerkamp wrote in her reports, that Mr. Sierra told her the passenger was the shooter, both immediately after the shooting and later at the police station.

¶ 68    As our supreme court has made clear, all of this evidence bearing on the *Biggers* factors is relevant as part of the totality of the circumstances under which the trier of fact made its credibility determinations. *Johnson*, 2026 IL 131337, ¶ 72. And all of it—in addition to other evidence, including Mr. Cabral's testimony that on the night of the shooting he was tired from staying up all of the previous night working, Mr. Sierra's observed intoxication that night, and the difficult circumstances under which Mr. Cabral initially made his identification in the hospital—was presented to and considered by the trial court.

¶ 69    We may no sooner reject the trial judge's credibility determinations in this case than we could the jury's credibility determinations in *Johnson*. *See People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009) (noting that the same deferential standard applies whether the defendant received a bench or jury trial). It is only proper to do so "where the record evidence *compels* the conclusion that no reasonable person could accept it beyond a reasonable doubt." (Emphasis added.) *Johnson*, 2026 IL 131337, ¶ 72. As Mr. Gracia notes, in rare circumstances "flaws in testimony ma[k]e it impossible for any fact finder reasonably to accept any part of it." *People v. Cunningham*, 212 Ill.

19

2d 274, 283 (2004). See, *e.g.*, *People v. Smith*, 185 Ill. 2d 532, 542-45 (1999) (identifying witness was significantly and repeatedly impeached, and her account conflicted with those of other eyewitnesses who were closer to the shooter but did not identify the defendant); *In re Christian W.*, 2017 IL App (1st) 162897, ¶¶ 29-78 (discussing how the sole eyewitness's account was contradictory, implausible, and had changed over time and depending on who was questioning him). Short of such extreme circumstances, however, "it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283.

¶ 70 Mr. Gracia makes much of the fact that Mr. Cabral equivocated, in his out-of-court statements and at trial, regarding whether he actually saw the passenger of the tow truck shoot him. What he never equivocated on, however, was that Mr. Gracia was the passenger of the truck. That is the testimony the trial court relied on. It was Mr. Sierra who, on more than one occasion, told Detective Westerkamp that the passenger was the shooter, though he could not see that person's face from where he was crouching behind Ms. Hernandez's car. While Mr. Sierra recanted this at trial, insisting that he saw nothing, remembered nothing, and was intoxicated on every occasion that he said anything different to the police, a recantation is "generally regarded as unreliable, especially where it might have resulted from duress or perceived threat." *Johnson*, 2026 IL 131337, ¶ 81. We must view the evidence in the light most favorable to the State and cannot substitute our judgment for the trier of fact's on a question involving the weight of the evidence or the credibility of a witness. *Gray*, 2017 IL 120958, ¶ 35. The trial judge, who saw Mr. Cabral and Mr. Sierra testify, was far better suited than us to assess their demeanor and decide whether their testimony at trial was influenced by fear of or allegiance to the defendants in this case.

¶ 71 Further, the account that Mr. Sierra gave Detective Westerkamp was, as the State notes, corroborated by the surveillance video of the shooting, which shows Mr. Sierra standing and

walking out of the frame as the tow truck arrives, contrary to his insistence at trial that he was already ducking behind the PT Cruiser and could not have seen anything.

¶ 72     In sum, although the partial identification provided by either witness, alone, may not have been sufficient to convict Mr. Gracia, together, and in the light most favorable to the State, they were sufficient for a reasonable trier of fact to find him guilty beyond a reasonable doubt.

¶ 73                   2. Whether the State Proved a Specific Intent to Shoot Mr. Sierra

¶ 74     Mr. Gracia separately argues that his conviction for attempted murder of Mr. Sierra must be reversed because the State failed to prove that he had the requisite intent to kill Mr. Sierra. He claims that the evidence at trial indicated that Mr. Cabral, not Mr. Sierra, was the target of the shooting. As noted above, proof of a specific intent to kill is a necessary element of attempted first degree murder, but it can be inferred from the act of knowingly firing a gun at another person. *Scott*, 2020 IL App (1st) 180200, ¶ 54. The trial court here found that Mr. Gracia intended to shoot and kill not only Mr. Cabral but also Mr. Sierra, who was shot at as he hid behind a nearby vehicle.

¶ 75     The evidence, including testimony from Ms. Hernandez and photos from the scene, demonstrated that the front driver's side window of her vehicle was shot out, and Mr. Sierra testified that he was crouched behind it on the passenger side. The trial court concluded that shots were fired intentionally at Mr. Sierra because footage from a different residential surveillance video, though it did not depict the area of the street where the shooting occurred, contained clear audio of two shots, a pause, and three more shots. That sequence—shots, a pause, and more shots— is consistent with what Detective Westerkamp recorded in the report she prepared after speaking with Mr. Sierra on the night of the shooting: "Sierra related Cabral and the males in the tow truck were arguing at which time the passenger of the tow truck fired shots at Cabral and then at Sierra before fleeing the scene." As noted above, the surveillance footage of the shooting itself shows

21

that Mr. Sierra was, contrary to his testimony at trial, not fully concealed behind the PT Cruiser when the tow truck arrived, such that the shooter could have seen him duck behind the vehicle.

¶ 76 In considering the sufficiency of the evidence to support a conviction, we must not only view the evidence in the light most favorable to the State but also draw all reasonable inferences in the State's favor. *People v. White*, 2017 IL App (1st) 142358, ¶ 14. A reasonable inference from the evidence presented here was that Mr. Sierra was an intended target of the second round of shots fired from the tow truck. That, together with the trial court's other findings, was sufficient for the court to find Mr. Gracia guilty beyond a reasonable doubt of attempting to murder Mr. Sierra.

¶ 77 B. Ineffective Assistance of Counsel

¶ 78 Mr. Gracia next argues that his trial counsel was ineffective for stipulating to the foundation for, and failing to affirmatively object to, the admission of text messages sent by Mr. Athans to Mr. Cabral just after the shooting. In those messages, Mr. Athans made statements expressing his love for Mr. Cabral, indicating that he was distraught by and in disbelief over what had happened, and begging Mr. Cabral to respond to him. Mr. Gracia argues that these statements, which were admissible as the statements of a party opponent party in Mr. Athans's case (Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015)), constituted inadmissible hearsay in his. He also claims that they supported the State's theory that it was Mr. Gracia, and not Mr. Athans, who was the shooter. Because "[t]he record is unclear as to whether the court relied on this testimony in finding [him] guilty," he insists, "in an abundance of caution" this court should conclude that his trial counsel's failure to object to them was ineffective assistance of counsel.

¶ 79 When reviewing a claim of ineffective assistance of counsel, we apply the stringent two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 209 Ill. 2d 194, 219 (2004). A defendant must prove both that (1) counsel's performance was deficient—that it fell

below an objective standard of reasonableness—and (2) he was prejudiced by that deficient performance because there is a reasonable probability that, without it, the result of the proceeding would have been different. *Id.* at 219-20. Mr. Gracia has failed to satisfy either prong.

¶ 80     There was no reason in these severed but simultaneous bench trials for Mr. Gracia's counsel to object to the admission of the text messages or refrain from stipulating to their foundation. The judge made clear at the outset that she would only consider relevant evidence as to each defendant, and the text messages were discussed substantively only during cross-examination of Detective Westerkamp by Mr. Athans's counsel.

¶ 81     As Mr. Gracia acknowledges, Illinois law "recognizes the ability of a trial judge sitting as a fact finder in a bench trial to separate the evidence offered against different defendants and to compartmentalize the cases to ensure the integrity of each defendant's trial." *People v. Abston*, 263 Ill. App. 3d 665, 671 (1994). Our supreme court noted in *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989), that "[t]o do so is no 'Herculean' task, but one which courts across the State engage in every day." In this circumstance and others, a reviewing court presumes that the trial court, as trier of fact, "considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion," a presumption that is only rebutted "where the record affirmatively shows the contrary." (Internal quotation marks omitted.) *People v. Smart*, 2025 IL 130127, ¶ 94. Where the text messages were clearly not admissible as evidence of Mr. Gracia's guilt, providing effective representation did not require his counsel to attempt to keep them from the trier of fact.

¶ 82     Mr. Gracia's attempt to establish prejudice fails for the same reason. He argues that the court's potential consideration of the text messages implicates the concerns raised in *Bruton v. United States*, 391 U.S. 123, 137 (1968), which held that, in a joint jury trial, the admission of an out-of-court statement by a non-testifying codefendant violates the confrontation clause where it

23

implicates the defendant. But this was neither a joint trial nor a jury trial. Mr. Gracia and Mr. Athans were tried in severed but simultaneous bench trials. Because nothing in the record affirmatively rebuts the presumption that the trial court, as the finder of fact, considered the text messages only in Mr. Athans's case, the concerns raised in *Bruton* are simply not present here, and Mr. Gracia's trial counsel was not ineffective.

¶ 83                                    IV. CONCLUSION

¶ 84    For all of the above reasons, we affirm Mr. Gracia's convictions for attempted first degree murder.

¶ 85    Affirmed.